514 So.2d 295 (1987)
Lazaro FARAGA
v.
STATE of Mississippi.
No. DP-62.
Supreme Court of Mississippi.
July 29, 1987.
Rehearing Denied November 12, 1987.
*296 Thomas H. Scruggs, Kenneth J. Rose, Sweet & Rose, Jackson, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by Marvin L. White, Jr., Asst. Atty. Gen., Felicia C. Adams, Sp. Asst. Atty. Gen., Jackson, and Orbie Craft, Dist. Atty., Brandon, for appellee.
Before the court en banc.
HAWKINS, Presiding Justice, for the Court:
Lazaro Faraga appeals from his conviction of the crime of capital murder in the circuit court of Rankin County and sentence to death. Numerous errors have been assigned which we have carefully examined. Persuaded no reversible error was committed, we affirm.

*297 FACTS
Memory, it has been said, can either be a paradise from which you cannot be evicted, or a hell from which there is no escape. If this be true, then certain travelers on U.S. I-20 witnessed an event at the Pelahatchie Exit in Rankin County on Thursday, December 19, 1985, which must surely place them in the latter category.
There  depending upon their view  shortly before noon on a clear day they saw some or all of the following: a maroon car was stopped in the left lane of the East bound traffic, with doors on both sides opened. Outside the car a man attempted to push a woman and small child clinging to the woman's leg into the path of an oncoming truck. The woman got back into the car, shut the door, only to have the man get the door open and pull her and a two-month-old baby from the car. He tore the child from the woman's arms and threw it onto the hood of a yellow car. He then picked the baby up, raised it over his head, and threw it onto the pavement. The woman got the baby and ran to the side of a truck parked nearby, yelling, "Oh, My God, my baby." She tried to get into the truck, but the door was locked, and again the man grabbed the infant and threw it to the pavement.
Before committing this atrocity he had walked around the car, kissed a little girl coming out of the car, and put her back into the car.
A paramedic witness tried to help the baby, which died a short while later. An autopsy subsequently revealed it died from multiple skull fractures and injuries to its brain.
Lazaro Faraga had been driving the maroon car. Faraga, 27 years old, was one of the Cuban refugees admitted to this country in 1980. In the car with Faraga were Sherry Royal, a woman with whom he had been living, Cachi, her five-year-old daughter (and presumably the child he kissed), two smaller children, twins, who were the children of Faraga and Royal, and the infant Lorenso Nathaniel Faraga, also known as Lorenso Nathaniel Royal.
Royal did not testify and all that is in this record as to the circumstances leading to this horror comes from Faraga. He had been in jail in Texas on a cocaine charge. Royal had gone to Texas with bail money obtained from Faraga's stepfather, and thereby got him released. The group were en route to Miami, Florida. Faraga testified in Spanish. Here is his translated story:
A. I was a prisoner in the jail in Texas. I went to doctor. He gave me a pill for my ulcer. The pill the doctor gave me I felt it in my head, it made my head swim. The doctor didn't touch me, didn't examine me. He gave me twelve pills. In five days I take. Every day I took two pills. I called my Daddy a lot of times by telephone. Three or four times. Then after, the police, they put me in another cell block. Two policemen got me by the feet and by the hands and put me in another cell block with crazy people. I told my Daddy about that by the telephone. The pills were making me crazy. When I left, they gave me liberty, my freedom. The seventeenth. The gentlemen who had let me out. Who paid the bail. The pill made me crazy. I left them in the motel. I left the boys and a lady, woman. I paid the motel bill in Louisiana. I left my watch and my ring. I went to the motel. I went to another motel and I went to sleep there. I got up the next morning. I felt the same in my head. I went to McDonald's to get meal. Supper. Then we came to Mississippi. When I was in Mississippi all the cars were in the freeway. They didn't let me pass. I flicked my lights. I blew the horn. Nobody let me pass, didn't let me pass. I got in the other line with the parked car. They followed, kept on. I stayed in the lane for ten minutes. I was going sixty, seventy-five miles an hour. Then I heard a voice in the car. The voice began to talk in my memory. If you love me, the voice said, if you love me, stop the car. I stopped the car. I ask for her to give me the baby. I said, give the *298 baby, give the baby. I went out in the middle of the street. I took the baby in the hand. I grabbed him by the leg. And I threw him down. There was an eighteen wheeler coming. And I beat on the door. The driver got down, got out and hit me. He hit me, when he hit me I got my senses back. When I recognize, there was a little baby, then I saw the baby there, then I said to myself, what have I done, what thing have I done. I didn't want to kill anybody. I didn't want to kill anybody. The pill had driven me crazy... . I understand God. I know what is going on. I have never seen this. The first time in my life my head has ever done that, head swimming, swimming. The doctor didn't examine me, didn't do anything. He just wrote down a prescription and gave me the pill. Everyday I took two pills. Everyday two pills. The only day that I didn't have a pill, the seventeenth. They put me with the crazy people in the lockup. And I called my Daddy by telephone. I'm not fooling anybody. I don't want to kill anybody. When I threw the baby down I didn't know what I was doing. I remembered what happened, I came to myself when that guy hit me. That's all.
Vol. II, pp. 162-164.
In direct and cross-examination of Faraga it was elicited that he had been jailed in Cuba on a political charge, as well as possession of a small amount of marijuana. His natural father died when he was an infant. He was homesick to see his mother and another child of his in Cuba. His stepfather came to the United States as one of the refugees. The name, location and whereabouts of his stepfather, or indeed any of these other people is not revealed in this record.
All this Court knows about the occupants of the car comes from Faraga's testimony at the sentencing phase. He did not think the baby he killed was his, but was certain the twins were. As to Royal, he testified:
Q. What did Sherry tell you that you had to go to jail for?
A. I don't know. She knew that I didn't love her, that I had another girlfriend. That was better than her. She was totally bad. Didn't respect me. Sherry hit me on the head. She didn't respect me. I caught her with an American smoking marijuana in the car.
Vol. II, p. 171.
Just before stopping his car on Interstate 20, he testified he threw his shoes, then his jacket, and then money out of the car window, but "The cars wouldn't let me pass my shoes out the window." (Vol. II, p. 171)
He denied that he killed the baby because of a rage he had got into with Royal, testifying:
A. No, no, only because of the pill. When Sherry and I had fought before I had never touched the kids. I changed the babies and bathed the babies. What do I want to kill a baby two months old for? Sherry Royal had give much milk to the baby. The baby was drooling milk out of the mouth.
Vol. II, p. 172
Cross-examination also developed the following:
Q. Mr. Faraga, is it true you told the police officers out there at the scene, "I kill baby." "Not my baby."
A. No, where the police came they put me on the ground, they put cuffs on me and they sat me down in the police car, "have you seen what you have done?" I said excuse me, I don't know what  then there came a Mexican who spoke some Spanish. Then the Mexican said, you have killed the baby. I said yeah. Then I didn't remember it. I didn't have conscious of it. Because the lick that the truck driver gave me brought me to my consciousness. When I came to my senses I realized that. Anybody to get a pill like that would be crazy. Anybody would be crazy. Pills that last seventy two hours, days. I took the twelve of them in prison. I felt very bad. *299 They changed me. They put me in a cell block with crazy people. Two policemen got me, one by the feet, one by the hand. And they put me in a cell block with a bunch of crazy people. They were screaming and shouting and I called on the telephone. Then the police in Texas had a saw. It was making a lot of noise. They were playing in the cell block where the crazy people were. I don't want to kill anybody, I don't want to kill anybody. It could happen with any young guy. Can't take that many pills. And people take that many pill. In Cuban prison they don't give pills. Cubans selling cocaine. Everybody here sells cocaine. Because they like money. In Cuba, no cocaine. I never seen cocaine in Cuba. Only here.
Vol. II, pp. 172-173.
Faraga stated that one Eddie Brown had come with Royal to Texas to make his bail (R. 165), but Brown was left behind and did not make the return trip. Faraga stated he had told Brown about the effect the pill had upon him.
As to the voices he heard, Faraga testified:
Q. So you are telling this jury that the voices told you about all these people and to stop the car but the voices did not tell you to kill the baby?
A. No, the voices did not tell me to kill. The voices mentioned many people to me. But they didn't tell me to kill the baby. Then the voices went away and I didn't hear anything. Then I felt like a crazy man. I asked the baby from her. The only one because I had more in the car. The only one I ask her for was this one. Give me here, give me here. She give it to me rapid. I don't know what was happening. The baby was crying and crying. She had given him a lot of milk. And he was drooling milk.
Vol. II, p. 175.
The only person appearing in this record who knew him before December 19, 1985, is Renee Long, who testified in his behalf at the sentencing phase. She was a student at a local college in Savannah, Georgia. She and Faraga had lived together for a year and a half. She testified he had talked about a barbecue business he had been in with another man, a job he had with a towing company, and the hard life he had in Cuba. He had shown her pictures of his five-year-old daughter in Cuba, and she knew he had two little boys, twins.
According to Long, Faraga was a "very loving, very caring" person for his children. She had heard him admonish another acquaintance of theirs for not taking care of his baby, and had offered to help the baby's mother. She had seen him kiss this baby.
She said Faraga was a ritualistic Catholic, who prayed all the time. She had never been afraid of him, but felt quite safe with him, testifying:
He is very kind. He is very sensitive and he cares. He cares a lot about people not to mention his babies. In fact, if I knew anything about Lazaro, about his babies, how he loved them, how he made sure they did not go without anything. He truly cared about them. He loved them. And there was no way, there is no way I could ever think he would ever harm the baby. He told me that a baby doesn't hurt anybody. The only thing a baby does is cry. If a baby cries, that means he is either hungry or is wet. And I really just don't understand it. That is not him. Under normal conditions he would not have committed this crime.
Vol. II, pp. 186-87.
Faraga was indicted by the Rankin County grand jury on January 14, 1986, for capital murder under Miss. Code Ann. § 97-3-19(2)(f) (Supp. 1984) in that he committed murder while engaged in the underlying felony of child abuse. See Miss. Code Ann. § 97-5-39(2) (Supp. 1984) (felonious child abuse statute).
When Faraga was brought before the circuit judge for arraignment on January 17, the court appointed Cullen Taylor, a *300 local attorney, to interview him, who reported that an interpreter was needed. The circuit judge thereupon continued the case for a week.
On January 24 the court appointed an interpreter, and thereafter all court proceedings were had in this manner. The court appointed Taylor to represent Faraga in the same order.
The record shows the following transpired at the January 24 arraignment:
BY THE COURT:
Mr. Taylor, you are the attorney for Lazaro Faraga?
BY MR. TAYLOR:
Your Honor, I was appointed primarily to obtain an interpreter to determine his indigency as to a state-appointed attorney and also for the reading of the indictment. I have discussed through the interpreter with Mr. Faraga, and he has advised me that his family would be able to hire an attorney. He has given a phone number and his stepfather's name. I advised him this morning that we would probably have the indictment read this morning, and I ask the Court for ten days for him to obtain an attorney and for that attorney to notify this Court, or we would proceed to appoint an attorney, or the Court would proceed. With that I would like to have the indictment read to him, and then, with permission of the Court, I'd like for him to make a phone call to his family.
BY THE COURT:
Are you satisfied that as far as his present funds as he is now locked up in jail that he is indigent at this time?
BY MR. TAYLOR:
At this individual time. Yes, sir.
BY THE COURT:
I am going to appoint you to represent him on a continuing basis until he has had an opportunity to get someone to assist him in communicating with his interpreter and with the officials in the jail. He needs someone now to try to help him make phone calls and to get funds from his family. I understand that you have obtained Mr. Tony Lee as a recommended interpreter to be appointed.
BY MR. TAYLOR:
Yes, sir.
Supp. Vol., pp. 265-266.
Following the appointment of Lee as an interpreter, the record continues:
BY THE COURT:
Can you communicate with him?
BY MR. LEE:
Yes, sir.
BY THE COURT:
Are you satisfied in talking with him that he does have a realistic potential for having his family helping him hire a lawyer for this case?
BY MR. LEE:
I don't know, sir. I can just tell what he said.
BY THE COURT:
Is that what he represents to you?
BY MR. LEE:
Yes, sir.
BY THE COURT:
He represents to you that he wants an opportunity to hire an attorney?
BY MR. LEE:
Yes, sir.
BY THE COURT:
I will defer this arraignment.
BY MR. TAYLOR:
Well, let me say this. I had advised him that we would go through the arraignment if the Court is desirous of that.
BY THE COURT:
All right. Let's arraign him. I will be appointing you, Mr. Taylor, and if [he] doesn't get anybody else, you will be it.
BY MR. TAYLOR:
Yes, sir.
BY THE COURT:
I guess I will try to talk through you, and you are going to have to try to communicate to him what I say.
BY MR. LEE:
We had practiced before that you will read the whole thing, and I will read it in Spanish.
BY THE COURT:
All right. You are Lazaro Faraga?

*301 BY MR. FARAGA:
Si.
BY THE COURT:
What is he saying?
BY MR. LEE:
Yes, sir.
BY THE COURT:
You have been indicted by the Rankin County Grand Jury for the crime of capital murder.
BY MR. FARAGA:
(Nods head)
BY THE COURT:
I will now read to you the indictment... .
Supp. Vol., pp. 268-270.
The circuit judge then read the indictment, which was translated into Spanish.
Faraga replied he was guilty.
Taylor then interposed that Faraga entered a plea of not guilty.
Pursuant to a motion by Taylor, the court on February 7 ordered that Faraga be committed to the Mississippi State Hospital at Whitfield for determination of his mental competency, and also his mental competency to stand trial. He was admitted February 10 and discharged February 13. It was the opinion of the evaluating staff that Faraga knew the difference between right and wrong, and that he was mentally competent to stand trial.
The defense filed a demurrer to the indictment on the ground that two offenses were charged when in fact only one, throwing the child upon the pavement, was committed, and that Faraga was only guilty of murder. The demurrer was overruled.
Other routine pretrial motions were filed.
The case came on for trial February 17. The State and defense both announced ready for trial.
At the guilt phase of the trial eyewitnesses testified to the events above related. In his closing argument Taylor conceded Faraga was guilty of murder, but argued Faraga had not killed the child in furtherance of the crime of child abuse, and therefore he should only be found guilty of murder.
The jury returned a verdict of guilty to capital murder, and the trial proceeded into the sentencing phase. The State adopted the evidence of the guilt phase to be considered by the jury in determining the penalty. Faraga and Long then testified as defense witnesses as above set forth.
In rebuttal the State produced Javous Blanchard, one of the eyewitnesses who had testified in the guilt phase. He said that Faraga had attempted to pull other children from the car and push them out in front of the cars. He testified several people had to hold Faraga down while he was fighting and struggling, and this lasted fifteen to twenty minutes before the sheriff got here. He said Faraga was speaking in Cuban but there were English statements he could understand. As to what Faraga had said, Blanchard testified: "Death to you white m____ f____, all kinds of derogatory statements."
The jury rendered a verdict on February 18 that the death penalty should be imposed, and a judgment imposing the death penalty was rendered the same date.

LAW

I.

THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY INSTRUCTING THE JURY THAT FARAGA COULD BE CONVICTED OF CAPITAL MURDER UNDER MISS. CODE ANN. § 97-3-19(2)(f).

II.

MISS. CODE ANN. S 97-5-39(2), THE STATUTE DEFINING FELONIOUS ABUSE AND/OR BATTERY OF A CHILD, IS VAGUE.
Faraga's first assignment presents a dual claim. He first contends that the Legislature did not intend for the capital murder statute, defined as a killing during the commission of felonious abuse and/or battery of a child, to apply to the facts of this case. Secondly, Faraga asserts that Miss. Code Ann. § 97-3-19(2)(f) is void on its face in light of the merger doctrine.
*302 Faraga's second assignment charges that the statute defining the underlying felony of child abuse is void for vagueness.
In 1983 Miss. Code Ann. § 97-3-19 was amended to include subsection (2)(f), which states:
(2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases;
* * * * * *
(f) When done with or without any design to effect death, by any person engaged in the commission of the crime of felonious abuse and/or battery of a child in violation of subsection (2) of section 97-5-39, or in any attempt to commit such felony;
Miss. Code Ann. § 97-5-39(2) (Supp. 1985) provides:
Any person who shall intentionally burn or torture, except in self-defense or in order to prevent bodily harm to a third party, whip, strike or otherwise abuse or mutilate any child in such a manner so that any bone is fractured or any part of the body of such child is mutilated, disfigured or destroyed, shall be guilty of felonious abuse and/or battery of the child, and upon conviction may be punished by imprisonment in the penitentiary for not more than twenty (20) years.
Following Faraga's trial, the Legislature amended this statute by adding the word "or" after the word "torture." Miss. Code Ann. § 97-5-39(2) (Supp. 1986).
Faraga first contends that there was no showing of an independent act which constituted felonious abuse and/or battery of a child. He alleges that since the facts of his case show one act caused death, there can be no felonious child abuse. Faraga contends that the statutes were passed by the Legislature to deter persistent child abuse, and in his case there was no pattern of abuse.
These arguments are without merit. Faraga's act of throwing a child to the pavement which resulted in skull fractures and broken bones clearly was intended to be classified as felonious abuse of a child under Miss. Code Ann. § 97-5-39(2). This statute does not require that the abuse be dispensed over a period of time before a charge for felonious abuse will arise. Therefore, Faraga's argument that he was a "first time child abuser" would not have prevented him from being punished under this statute had the infant lived.
Since the infant died, we look to the capital murder statute for Faraga's punishment. We note the capital murder provision, Miss. Code Ann. § 97-3-19(2)(f) provides "when done with or without any design to effect death, ..."[1]
The intent of the Legislature was that serious child abusers would be guilty of capital murder if the child died. These are the precise facts before this Court. As this Court has stated in prior decisions, the Legislature's prerogative is to define crimes and set the punishment for offenders, and this prerogative is given great latitude. Peterson v. State, 268 So.2d 335 (Miss. 1972); Capler v. State, 237 So.2d 445 (Miss. 1970).
Moreover, Faraga's hypothetical that one act caused the death is seriously undermined by the eyewitness testimony that the infant endured three blows at the hands of the defendant.
Faraga next argues that Miss. Code Ann. § 97-3-19(2)(f) is void because the merger doctrine applies. The merger doctrine, which developed as a limitation of the felony-murder doctrine, applies when the underlying felony is "merged" with the killing and cannot be treated as a separate crime. Faraga asserts the merger doctrine should apply in his case because the underlying felony (felonious child abuse) was an aggravated battery necessarily included in the killing.
Recently this Court declined to adopt the merger doctrine in Smith v. State, 499 So.2d 750 (Miss. 1986). In that case the *303 jury found that Grady Smith forcibly entered a home (burglary) where he shot William Carter. Smith was convicted of capital murder based on the underlying felony of burglary. See Miss. Code Ann. § 97-3-19(2)(e) (Supp. 1986). This Court, through Justice Walker, stated:
We decline to adopt the merger doctrine and hold that under our felony-murder statute, the underlying felony does not merge into the murder. Our statutory provisions dealing with murder in the particular felony in this case, burglary, are intended to protect different societal interests.
499 So.2d at 754.
We likewise find the societal interests are also different regarding our capital murder statute and our felonious child abuse statute. While the latter statute is intended to protect the child, the former statute is designed to punish and act as a deterrent to such crimes should death result.
Faraga's next contention is that Miss. Code Ann. § 97-5-39(2) was vague at the time of his trial, and the Legislature amended this allegedly vague statute as follows:
Any person who shall intentionally burn or torture, or ... whip, strike or otherwise abuse or mutilate any child ... shall be guilty of felonious abuse and/or battery of a child, ... [Emphasis added]
Miss. Code Ann. § 97-5-39(2) (Supp. 1986).
Faraga argues that during his trial the statute could have been read conjunctively and therefore require that the defendant "burn or torture and ... whip, strike, or otherwise abuse or mutilate any child ..."
A criminal statute must provide a person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited. Cumbest v. State, 456 So.2d 209 (Miss. 1984). To allow Faraga's construction to stand would in effect advocate the pummeling and mutilation of children as long as neither torture nor a burning was involved.
Accordingly, we reject these assignments of error.

III.

PROSECUTORIAL MISCONDUCT VIOLATED FARAGA'S RIGHT TO A FUNDAMENTALLY FAIR, NON-ARBITRARY CAPITAL PROCEEDING.
Faraga points out three statements made by the district attorney during closing argument. Faraga contends these statements prejudiced the jury and denied him of a fair trial. Although no objection was raised during the argument, under this Court's heightened level of scrutiny for death penalty cases, they will be reviewed.
At closing argument during the trial phase, the prosecutor stated:
You know all the time [you] hear grumbling about they letting this one go and they letting that one go. It's your turn. It's not them anymore. It is you. Don't turn this man loose. Don't convict him of a simple murder. Under the law it is capital murder. We ask that this matter be fully decided. Thank you.
Faraga contends that he would not be turned loose if convicted of simple murder.
We find that this brief comment did not prejudice or influence the jury as to their duty. Defense counsel based his closing argument on the premise that Faraga should be convicted of murder and not capital murder. The prosecutor's remark was proper rebuttal. These remarks cannot be construed as arguing the possibility of parole, Williams v. State, 445 So.2d 798 (Miss. 1984), and do not rise to the level of reversible error, if indeed they are error at all.
Faraga next asserts that during closing argument in the sentencing phase, the District Attorney improperly argued that Faraga had spent six years in jail in Cuba, that he was arrested and imprisoned in Texas, both of which showed "a significant history of criminal activity." Faraga contends that since there were no certified copies of his Cuban convictions and there was no conviction in Texas, these facts were used against him as an aggravating circumstance.
*304 To the contrary, defense counsel emphasized the fact that his absence of criminal activity should be regarded as a mitigating circumstance. Therefore it was perfectly proper for the District Attorney rebut this argument by pointing to his arrest in Texas and imprisonment in Cuba. While it is true that no convictions were introduced, the mitigating circumstance in question states that "the defendant has no significant history of prior criminal activity". The Tennessee Supreme Court considered this question in State v. Matson, 666 S.W.2d 41 (Tenn. 1984), where the defendant argued the statute referred only to prior criminal convictions:
The fallacy in this argument is that the statutory reference is to a mitigating circumstance, not an aggravating one. The accused is entitled to show that he has not even been previously arrested, and he is not confined in his evidence to showing lack of prior conviction. On the other hand, when he relies upon this particular statutory mitigating circumstance, he inevitably becomes subject to rebuttal evidence offered by the prosecution showing prior criminal activity. Neither the prosecution nor the defense is limited under this statutory provision to proof of prior convictions.
Id. at 44.
In the instant case, Faraga admitted that he had previously been convicted in Cuba for possession of marijuana. He also admitted he was imprisoned in Cuba for four years as a political prisoner. He also admitted that he had been arrested in Texas but was not convicted of anything. Based on the above, the District Attorney was within the reasonable bounds of fairness when he argued Faraga had a significant history of criminal activity.
Faraga next contends that the prosecutor improperly argued the possibility of parole when he stated:
Ladies and gentlemen, this man is dangerous. He does not need a life sentence. Mr. Taylor tells you, give him a life sentence. That when he gets through doing his life sentence that he can make something out of himself. He can be corrected during this life sentence and when he gets out, he can make something out of himself. Don't let the man out. He has no business out. Protect society. Don't let him out. Vote for the death penalty.
Faraga contends this prejudiced him by interjecting the possibility of parole to the jury. See, e.g., Mhoon v. State, 464 So.2d 77 (Miss. 1985). After reading the arguments of both defense counsel and the District Attorney during the sentencing phase, we fail to see where the issue of parole was argued. In any event, this comment was made in response to defense counsel, who argued in closing: "can [Faraga] be corrected and live a useful life afterwards?" The prosecutor's remarks were proper in rebuttal. Evans v. State, 422 So.2d 737 (Miss. 1982).
Faraga next asserts prosecutorial misconduct occurred when the District Attorney interjected racial prejudice into the trial by allowing Javous Blanchard to repeat the statements made by Faraga when he was struggling.
A reading of the record shows that there was no prejudicial injection of the race issue into this trial. Blanchard was first called during the State's case-in-chief. At that time, Blanchard was instructed by the District Attorney not to repeat what Faraga said, and Blanchard only testified that he helped hold Faraga down and heard Faraga yelling statements. After Faraga testified during the sentencing phase that he regained his senses after killing the infant, Blanchard was recalled to the stand to rebut this claim. The trial judge noted that Blanchard's testimony "was proper for the jury to consider for the purpose of impeaching Mr. Faraga's testimony as to his activities in the events immediately following the incident, dropping the baby." We agree that this was proper rebuttal.
After carefully reading all arguments of the State and defense, we fail to find any reversible error in the argument of the District Attorney. Stringer v. State, 500 So.2d 928 (Miss. 1986).

*305 IV.

DEPRIVATION OF 6TH AMENDMENT RIGHT TO SECURE COUNSEL OF CHOICE AND DENIAL OF CONTINUANCE PRIOR TO THE CAPITAL SENTENCING PHASE.
Faraga first argues the circuit court deprived him of an opportunity to secure his own counsel in the pre-trial proceedings. The record gives no support for this contention. On January 24, 1986, the court appointed Taylor and an interpreter. Taylor advised the court he had conferred with Faraga through the interpreter, who told him his family would hire an attorney, and had given Taylor a telephone number. Taylor also told Faraga he would probably be arraigned that day, and that he would ask the court for ten days for Faraga to obtain an attorney.
The interpreter then informed the circuit judge that Faraga wanted an opportunity to hire private counsel. The circuit judge then stated he would defer arraignment.
With that, Taylor informed the court that he had advised Faraga he would be arraigned that day. The circuit judge then proceeded with the arraignment and a plea of not guilty was entered.
Under the circumstances the arraignment was premature and should have been deferred. No attorney should attempt to represent an accused piecemeal. He is either the defendant's attorney or he is not, and an arraignment is manifestly a meaningful part of trial proceedings. Estes v. State, 326 So.2d 786, 788 (Miss. 1976); Pendergraft v. State, 191 So.2d 830 (Miss. 1966). Taylor should not have attempted to act as Faraga's attorney on an arraignment, nor should the circuit court have permitted it until his status as Faraga's attorney had been settled.
This being said, however, it is manifest no prejudice occurred because a plea of not guilty was entered, and even if it was not settled on January 24 that Taylor would remain his attorney, this arrangement did become final. There was a three-week lapse between the time of Faraga's arraignment and beginning of trial. No further mention of another attorney came about during this interim, or at the beginning of trial. The first mention of another attorney came only following the verdict in the guilt phase. From this record we can only conclude that Faraga decided in the three-week period to rely on Taylor to conduct his defense. His unhappiness, if any, did not begin until the trial was underway.
Faraga next contends the circuit court should have granted a continuance following the guilt phase, and before the sentencing phase, for him to hire another attorney. The record shows the following:

Mr. Taylor: Your Honor, prior to the jury being called back out, on behalf of my client, I would like to make a motion to this Court requesting the continuance of the sentencing phase so that Lazaro Faraga can contact his step Father so as to hire another attorney to represent him during the sentencing phase.

Judge Goza: Mr. Taylor, I think Mr. Faraga is effectively represented by the most competent counsel available and the motion will be denied.
Vol. II, p. 159.
The argument that the circuit judge erred in not stopping the trial and permitting Faraga to get other counsel is flawed. If Faraga wanted another attorney besides Taylor, he should have notified the court of such fact prior to trial, together with prospective counsel's name and address. As noted, in the three-week interim this was never done. There is certainly no obligation on the part of a trial court, in the absence of some very compelling and obvious reason, to permit a defendant to change counsel in the middle of a trial. See Augustine v. State, 201 Miss. 277, 28 So.2d 243 (1946) (actual prejudice must be shown by defendant). Indeed, it is difficult to conceive that any rational attorney, unfamiliar with what had transpired in a trial, would ever agree to undertake the defense of an accused in the middle of trial proceedings.
It was an absurd request, and the only reason given in this record is from Taylor himself, who stated in his motion to *306 withdraw that during the course of the trial Faraga became uncooperative with him. The lower court acted within its discretion in denying the motion to withdraw. Taylor v. State, 435 So.2d 701 (Miss. 1983); Harris v. State, 386 So.2d 393 (Miss. 1980); Burnett v. State, 285 So.2d 783 (Miss. 1973).
On March 4, 1986, a new attorney entered an appearance and gave notice of appeal.

V.

INEFFECTIVE ASSISTANCE OF COUNSEL DEPRIVED FARAGA OF HIS SIXTH AMENDMENT RIGHTS.
Faraga next attempts to crack the increasingly tough nut of ineffective assistance of counsel. The applicable test is Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), where the U.S. Supreme Court held that a claim of ineffective assistance of counsel has two components.
First, a defendant must show that counsel's performance was deficient by identifying specific acts and omissions. Counsel's conduct, viewed as of the time of the actions taken, must have fallen outside of a wide range of reasonable professional assistance. In assessing a right to counsel's claim, an attorney's actions are strongly presumed to have fallen within that range, and a court must examine counsel's conduct without the use of judicial hindsight. King v. Strickland, 748 F.2d 1462, 1463 (11th Cir.1984) (11th Circuit application of Strickland test).
Second, a defendant must show that the deficient performance was prejudicial. Strickland follows a standard that requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland v. Washington, 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.
Under the standard set forth in Strickland, a defendant claiming ineffective assistance of counsel must overcome a strong presumption that his attorney's actions might be considered sound trial strategy. For purposes of the instant case, we should keep in mind that a case of clear guilt supported by confessions and direct evidence is less likely to support a claim of ineffectiveness, since the second (prejudice) prong of the Strickland test will be difficult to meet. Messer v. Kemp, 760 F.2d 1080, 1092 (11th Cir.1985); 466 U.S. at 688-91, 104 S.Ct. at 2065-66, 80 L.Ed.2d at 694-95.
This Court has followed the guidelines of Strickland in a number of decisions. See, e.g., Leatherwood v. State, 473 So.2d 964 (Miss. 1985).
With these principles in place, we now consider Faraga's enumerated errors of counsel.

A.

THE COUNSEL OF CHOICE ERROR.
Faraga states that defense counsel made no effort to insure he was represented by counsel of choice. Faraga further contends Taylor made no effort to contact his stepfather to determine what steps had been taken to procure/retain counsel.
First, it should be noted that this statement is unsupported by anything in the record. Additionally, this alleged error essentially begs the question. Faraga is contending that Taylor ineffectively assisted him by not retaining someone else to assist the defendant.

B.

PRESERVATION OF THE RECORD.
Faraga contends Taylor failed to insure that the pre-trial proceedings were recorded. This statement is unsupported by the record.

C.

CHANGE OF VENUE.
Faraga contends that due to the abundance of prejudicial pre-trial publicity, *307 Taylor should have moved for change of venue either before trial or during voir dire. Voir dire indicated that every person in the venire had heard of this case. (R. 35-36)
Concerning the first prong of Strickland, this would fall into the realm of trial strategy, since defense counsel is under no duty to make such a motion. Murray v. Carrier, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). The fact that there has been widespread publicity in a county about a particular crime does not necessarily mean that a prudent defense counsel will want to have the case tried in another county. There must be a weighing of the odds. Most of the judges and trial lawyers of this state are aware of a statistical distinct disparity between counties in the willingness of juries to impose the death penalty. For some reason, also, some counties appear more "conviction prone" than others. We are also aware of defense lawyers who, in hindsight, have profoundly regretted a circuit judge sustaining their change of venue motion.
In any event, it is unlikely the second prong of Strickland, could be hurdled based on the overwhelming evidence presented at trial.

D.

THE SCOPE OF VOIR DIRE.
Faraga contends that Taylor's conducting of voir dire was inadequate and prejudicial. The basis of this claim is that Taylor learned that several jurors were related to police officers but did not inquire into their relationship. However, Faraga's allegation is unclear as to what jurors were struck either by cause or by peremptory. The record is not helpful in this respect. It should be noted that Taylor had made a motion for additional peremptory strikes. Due to the absence of specific facts, we cannot determine whether Taylor's actions were "unprofessional errors" or "legitimate trial strategy."

E.

PREPARATION FOR TRIAL.
Faraga states that Taylor was unprepared for trial and prejudice resulted. Again, the absence of any supporting facts prevents this Court from properly considering this alleged error.

F.

DEFENSE AT THE GUILT PHASE.
Faraga argues that Taylor was ineffective during the guilt phase in which he made the following argument
I'm not going to come up here and say ... this was a mistake or whatever. I'm not going to come up here and try to holler, hey, they didn't prove that this child was living at the time they saw a bundle of something slammed to the concrete. I'm not going to come up here and argue that they've not proven the things necessary to bring back a verdict of murder. But I am going to argue that you were being slighted with the facts in regard to that being murder or capital murder.
* * * * * *
Refresh your minds in regard to these instructions the court gave you and with the testimony you have received and the instructions you have been given, then go and deliberate and bring back a verdict of murder because what has been given to you today is not a felonious murder grouping. The defendant, Lazaro Faraga, was not intending and started out doing [sic] child abuse to the child. The child was killed and the child was killed by Lazaro Faraga, but he did not kill that child in the furtherness [sic] of felonious child abuse. His efforts, his intentions was to do harm to the woman. I know it is terrible that he pitched a child, but it was evident from the evidence in the testimony that he was vividly upset. That it was difficult to restrain him. That three people had to help hold him down. And one as a pretty large person. That is not somebody that is just going to be feloniously abusing a two-month-old child. But that is somebody that has built up inside of them some heated, *308 unbelievable passion against someone. My contention is, ladies and gentlemen, is that it was murder but not capital murder. [Emphasis added]
(R. 144, 148) Thus, Taylor conceded his client might very well be guilty of murder but not capital murder.
Of course, no attorney representing a client who has pleaded not guilty should concede in his oral argument to a jury that his client was in fact guilty of the crime charged in the indictment. See: Wiley v. Sowders, 647 F.2d 642, 650 (6th Cir.1981); Francis v. Spraggins, 720 F.2d 1190, 1193 (11th Cir.1983); Young v. Zant, 506 F. Supp. 274 (M.D.Ga. 1980), aff'd, 677 F.2d 792, 797, n. 10 (11th Cir.1982); People v. Carter, 41 Ill. App.3d 425, 354 N.E.2d 482, 485 (1976); Commonwealth v. Lane, 476 Pa. 258, 382 A.2d 460, 461 (1978).
When proof of certain facts is overwhelming, however, an attorney may find it strategically prudent to concede such facts while still denying that his client is guilty of the crime charged in the indictment. In this case, Faraga did not take the witness stand during the guilt phase, and the view of the psychiatric staff at the Mississippi State Hospital was unanimous that he was sane. The proof offered at trial was overwhelming that he did murder the infant. Insanity being tactically foreclosed, Taylor very well could have concluded he had no defense to argue to the jury that his client was not guilty of murder. He did, however, have a factual argument that it was not capital murder, as the law was set forth by the court to the jury in Instruction No. 5. We concede that such argument is more of a legal argument and less likely to get the attention of a jury than of a judge for a slaying this atrocious. Taylor's legal argument, as above noted, was that his client was not guilty of killing this infant while engaged in the felonious crime of child abuse, but of simple murder accomplished by slinging the child to the pavement.
It should also be borne in mind that the candor by Taylor at the guilt phase could have helped Faraga in the sentencing phase. An attorney who, while sincerely trying to help his client, at the same time is open and honest with the jury is more likely to receive a sympathetic and open ear in his other arguments.
We have carefully examined the above cases in which courts have concluded an admission of guilty by defense counsel in oral argument rendered ineffective legal assistance as guaranteed by the 6th Amendment, and find them distinguishable. In Wiley v. Sowers, People v. Carter, and Commonwealth v. Lane, supra, defense counsel inexplicably admitted their clients were guilty of the crime charged in the indictment. In Francis v. Spraggins, supra, after the accused had taken the stand and denied any knowledge of participating in crimes, defense counsel admitted in his argument his client "committed the crime of murder probably," but argued he was mentally retarded and was intoxicated on drugs. 720 F.2d at 1193, n. 7.
We find Taylor's closing argument was the product of a tactical decision and the best argument he could make given the circumstances under which he found his client.

G.

THE SENTENCING PHASE.
Finally, Faraga complains of Taylor's failure to present any expert psychological testimony at the sentencing phase.
From this record we cannot find defense counsel remiss during the sentencing phase of the trial. He allowed Faraga to take the stand and testify as to his religious background, family and friends, and remorse for the crime he had committed. Taylor also arranged for a Savannah friend to appear and testify that Faraga was a loving, caring father and there had been no prior history of child abuse. Taylor also argued forcefully to the jury to consider Faraga's mitigating circumstances such as age, lack of prior criminal history, etc.
In conclusion, Taylor's representation at the sentencing phase was competent and effective.

*309 VI.

THE INADEQUATE PROVISION OF EXPERT PSYCHOLOGICAL ASSISTANCE VIOLATED FARAGA'S RIGHTS TO DUE PROCESS AND EQUAL PROTECTION.
Here Faraga complains that the Whitfield evaluation was insufficient, that an independent psychological evaluation should have been given, and Faraga's psychological state made it crucial that he receive expert assistance.
We first note that the Whitfield examination was much more than a cursory interview. In addition, there is nothing in the record to show an independent evaluation would have been of any benefit.
Any complaints Faraga has here relates back to Taylor's decision not to employ the insanity defense at the trial phase. Since insanity was never in issue, this assignment of error is not relevant. The cases cited by Faraga which emphasize the importance of independent evaluation of psychological evidence all dealt with cases where insanity was in issue at trial.

VII.

THE AGGRAVATING CIRCUMSTANCES UPON WHICH THE JURY RELIED IN THIS CASE ARE OVERBROAD AND VAGUE AS APPLIED, AND DUPLICATIVE OF THE UNDERLYING FELONY, IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS.
Faraga asserts that each aggravating factor are unconstitutionally void as aggravating factors, first stating that the inclusion of the underlying felony of child abuse as an aggravating factor is vague. This argument has been addressed by this Court on several occasions. See Jordan v. State, 464 So.2d 475 (Miss. 1985); Tokman v. State, 435 So.2d 664 (Miss. 1983); Leatherwood v. State, 435 So.2d 645 (Miss. 1983).
Faraga next charges that the submission of "heinous, atrocious, or cruel" as an aggravating factor is unconstitutionally vague. This argument has likewise been dismissed many times by this Court. Stringer v. State, 454 So.2d 468 (Miss. 1984); Mhoon v. State, 464 So.2d 77 (Miss. 1985); Wiley v. State, 484 So.2d 339 (Miss. 1986).
Faraga makes a final argument that if this Court finds one aggravating circumstance invalid, the penalty should be reversed. This Court has held on numerous occasions that the death sentence is valid if based on a single statutory aggravating factor. Stringer, supra; Edwards v. State, 441 So.2d 84 (Miss. 1983); Tokman v. State, supra; Evans v. State, 422 So.2d 737 (Miss. 1982).

VIII.

THE SENTENCE OF DEATH IS ARBITRARY AND DISPROPORTIONATE AS APPLIED TO THE FACTS OF THIS CASE.
As the facts reveal, there is no merit to this contention.
AFFIRMED AND WEDNESDAY, SEPTEMBER 16, 1987, IS SET AS THE DATE FOR EXECUTION OF THE SENTENCE AND INFLICTION OF THE DEATH PENALTY IN THE MANNER PRESCRIBED BY LAW.
WALKER, C.J., ROY NOBLE LEE, P.J., and DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN, ANDERSON and GRIFFIN, JJ., concur.
ROBERTSON and GRIFFIN, JJ., concur by separate written opinion.

APPENDIX "A"

DEATH CASES AFFIRMED BY THIS COURT:
Wiley v. State, 484 So.2d 339 (Miss. 1986).
Johnson v. State, 477 So.2d 196 (Miss. 1985).
Gray v. State, 472 So.2d 409 (Miss. 1985).
Cabello v. State, 471 So.2d 332 (Miss. 1985).
Jordan v. State, 464 So.2d 475 (Miss. 1985).
Wilcher v. State, 455 So.2d 727 (Miss. 1984).
Billiot v. State, 454 So.2d 445 (Miss. 1984).
*310 Stringer v. State, 454 So.2d 468 (Miss. 1984).
Dufour v. State, 453 So.2d 337 (Miss. 1984).
Neal v. State, 451 So.2d 743 (Miss. 1984).
Booker v. State, 449 So.2d 209 (Miss. 1984).
Wilcher v. State, 448 So.2d 927 (Miss. 1984).
Caldwell v. State, 443 So.2d 806 (Miss. 1983).
Irving v. State, 441 So.2d 846 (Miss. 1983).
Tokman v. State, 435 So.2d 664 (Miss. 1983).
Leatherwood v. State, 435 So.2d 645 (Miss. 1983).
Hill v. State, 432 So.2d 427 (Miss. 1983).
Pruett v. State, 431 So.2d 1101 (Miss. 1983).
Gilliard v. State, 428 So.2d 576 (Miss. 1983).
Evans v. State, 422 So.2d 737 (Miss. 1982).
King v. State, 421 So.2d 1009 (Miss. 1982).
Wheat v. State, 420 So.2d 229 (Miss. 1982).
Smith v. State, 419 So.2d 563 (Miss. 1982).
Johnson v. State, 416 So.2d 383 (Miss. 1982).
Edwards v. State, 413 So.2d 1007 (Miss. 1982).
Bullock v. State, 391 So.2d 601 (Miss. 1980).
Reddix v. State, 381 So.2d 999 (Miss. 1980).
Jones v. State, 381 So.2d 983 (Miss. 1980).
Culberson v. State, 379 So.2d 499 (Miss. 1979).
Gray v. State, 375 So.2d 994 (Miss. 1979).
Jordan v. State, 365 So.2d 1198 (Miss. 1978).
Voyles v. State, 362 So.2d 1236 (Miss. 1978).
Irving v. State, 361 So.2d 1360 (Miss. 1978).
Washington v. State, 361 So.2d 61 (Miss. 1978).
Bell v. State, 360 So.2d 1206 (Miss. 1978).

DEATH CASES REVERSED AS TO GUILT PHASE AND SENTENCE PHASE:
Smith v. State, 499 So.2d 750 (Miss. 1986).
West v. State, 485 So.2d 681 (Miss. 1985).
Fisher v. State, 481 So.2d 203 (Miss. 1985).
Johnson v. State, 476 So.2d 1195 (Miss. 1985).
Fuselier v. State, 468 So.2d 45 (Miss. 1985).
West v. State, 463 So.2d 1048 (Miss. 1985).
Jones v. State, 461 So.2d 686 (Miss. 1984).
Moffett v. State, 456 So.2d 714 (Miss. 1984).
Lanier v. State, 450 So.2d 69 (Miss. 1984).
Laney v. State, 421 So.2d 1216 (Miss. 1982).

DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR RESENTENCING TO LIFE IMPRISONMENT:
Edwards v. State, 441 So.2d 84 (Miss. 1983).
Dycus v. State, 440 So.2d 246 (Miss. 1983).
Coleman v. State, 378 So.2d 640 (Miss. 1979).

DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR A NEW TRIAL ON SENTENCING PHASE ONLY:
Stringer v. State, 500 So.2d 928 (Miss. 1986).
Pinkton v. State, 481 So.2d 306 (Miss. 1985).
Mhoon v. State, 464 So.2d 77 (Miss. 1985).
Cannaday v. State, 455 So.2d 713 (Miss. 1984).
Wiley v. State, 449 So.2d 756 (Miss. 1984).
Williams v. State, 445 So.2d 798 (Miss. 1984).
ROBERTSON, Justice, concurring:

I.
I concur in the judgment announced this day and in much of the opinion authored for the Court by Presiding Justice Hawkins. With respect to one issue, however, that involving the so-called "merger doctrine", discussed at pages 302 and 303, more need be said.
The Court's opinion rejects merger in the capital murder/underlying felony context. *311 We correctly so held in Smith v. State, 499 So.2d 750, 753-54 (Miss. 1986), though in a discussion which, with the benefit of hindsight, I find inadequate. Today's decision on merger is downright cryptic and even more troublesome, for there is an important legal distinction between the so-called underlying felonies of burglary under Section 97-3-19(2)(e), as in Smith, and felonious child abuse under Section 97-3-19(2)(f), as here.
My point is twofold: in the context of lesser-included offenses we have long ago accepted merger as a part of our criminal law, although we do not always call it that. I trust nothing said today will be seen as disturbing that view. On the other hand, the reasons why the merger doctrine should not be applied in today's capital murder/underlying felony context need be stated with more care than has been done to date.
Simply put, the sort of merger for which Faraga argues is precluded by the language of the statute, not because one might imagine different societal interests underlying our capital murder statute and our felonious child abuse statute. Moreover, lesser included offense merger is not involved in any issue presented in this case. That sort of merger is indeed available to Faraga should the State, for example, seek to prosecute him for murder or felonious child abuse arising out of the facts of this case.

II.
We rejected the merger doctrine long before Smith. See Laura v. State, 26 Miss. 174, 175 (1853). Then, as now, we failed to make clear just what it is that had been rejected. The point is important for there is at least one form of merger that we would not think of discarding. That is where a single act could render one subject to prosecution for two or more offenses, one a greater offense and the other, in a sense, a lesser included offense.
Imagine, for example, Arnold Aardvark who wields a deadly weapon and strikes and kills Hapless Harry. Aardvark's conduct may constitute murder, Miss. Code Ann. § 97-3-19(1) (Supp. 1986). Likely, it will also include all elements requisite to labeling it aggravated assault, Miss. Code Ann. § 97-3-7(2) (Supp. 1986), or several other forms of assault, Miss. Code Ann. § 97-3-9 et seq. (1972). No one would suggest that Aardvark could be prosecuted, convicted and separately sentenced for all of these offenses.[1] If the prosecution elects to proceed on the murder charge, the assaults as lesser offenses are deemed merged into the murder. Compare Perkins, Criminal Law 478-79 (1957).
Similarly, should Aardvark be convicted of capital murder, for example, of murder/rape within Section 97-3-19(2)(e), all lesser homicides such as murder [Miss. Code Ann. § 97-3-19(1) (Supp. 1986)] and manslaughter [Miss. Code Ann. § 97-3-31 et seq. (1972)] would be deemed merged into the capital murder. And this would be so notwithstanding there be an element to the offense of manslaughter  killing in the heat of passion  which is not necessarily an element of the offense of capital murder. See Isom v. State, 481 So.2d 820, 825 (Miss. 1985) (Robertson, J., concurring). In that hypothetical Aardvark's crime of rape would in law also be merged into his capital murder conviction, so that he could not subsequently be prosecuted for that rape.
Constitutionally, each state has the authority to declare criminally unlawful separate components of the same transaction or occurrence, in the sense that one who breaks and enters a dwelling and sexually assaults its female occupant may be prosecuted separately for burglary and rape. Armstead v. State, 503 So.2d 281, 284 (Miss. 1987); Smith v. State, 429 So.2d 252, 253 (Miss. 1983). See also Missouri v. Hunter, 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983); Brown v. Ohio, 432 *312 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977). Similarly, one who does the same thing twice, albeit in rapid succession, may be prosecuted for each criminal act. Pharr v. State, 465 So.2d 294, 299-301 (Miss. 1984); Ball v. State, 437 So.2d 423, 425 (Miss. 1983). But where no further evidence is needed to establish the lesser offense, once the prosecution has proved the greater offense, legal merger occurs. Our law allows that the defendant may be convicted and sentenced for one of those offenses  the greater or the lesser included  but not both.
In the felony murder context the defendant may be convicted and sentenced for felony murder or the underlying felony  but not both. As a matter of federal law, this conclusion is mandated by the Double Jeopardy Clause of the Fifth Amendment. Harris v. Oklahoma, 433 U.S. 682, 682-83, 97 S.Ct. 2912, 2912-13, 53 L.Ed.2d 1054, 1056 (1977). As a matter of state law, the conclusion has two independent bases: the Double Jeopardy Clause of Miss. Const. Art. 3, § 22 (1890) and our common law merger rule.

III.
Historically, the majority is partially correct in noting that the merger doctrine developed as a limitation upon the common law felony murder rule. The felony murder doctrine made all homicides "murder" if they occurred during the commission or attempted commission of a felony. 2 LaFave and Scott, Substantive Criminal Law § 7.5 (1986); 1 Wharton's Criminal Law § 24 (Torcia Ed. 1978); Comment, The Felony-Murder Rule, 6 W.New.Eng.L.Rev. 1081, 1087 (1984); Comment, The Merger Doctrine As A Limitation On the Felony Murder Rule: A Balance Of Criminal Law Principles, 13 Wake Forest L.Rev. 369, 377 (1977). As the number of defined felonies increased, the inflexibility and harshness of felony murder was alleviated by creation of limiting corollaries including (1) limitation of triggering felonies to dangerous crimes, (2) a requirement that the death occur during the commission of the felony, (3) a requirement of proximate cause, and (4) our subject for today, the merger doctrine. LaFave and Scott, Criminal Law, § 7.5 at 622-23 (2d Ed. 1986).
This form of the merger doctrine was developed almost exclusively by states whose statutory schemes, unlike Mississippi's, provided for degrees of murder. Courts in those states feared obliteration of distinctions between killings if the law allowed assaultive conduct to become an underlying felony. This could result in all unexcused or unjustified homicides being elevated to first degree murder. State v. Wanrow, 91 Wash.2d 301, 588 P.2d 1320 (1978); People v. Sears, 2 Cal.3d 180, 84 Cal. Rptr. 711, 465 P.2d 847 (1970); see also Crump and Crump, In Defense of the Felony Murder Doctrine, 8 Harv.J.Law and Public Policy 359, 377 (1985).
States declining to ascribe to the merger concept have customarily done so "on the basis that it is not required by their particular statutory provisions." State v. O'Blasney, 297 N.W.2d 797, 799 (S.D. 1980), reversed on other grounds, sub. nom. O'Blasney v. Solem, 774 F.2d 925 (8th Cir.1985). In O'Blasney the South Dakota Supreme Court, addressing a claim that the felony of child abuse merged into the ultimate murder, declined to tamper with legislative prerogative and refused the merger doctrine, noting that
"our legislature has not established degrees of murder. Likewise, we do not presume to say our legislature did not intend the felony of child abuse to be included within the reach of the deterrent effect of the felony murder statute ...
297 N.W.2d at 800.
Smith held that the burglary did not merge into the murder. The reason Smith is correct, in contrast to what the opinion says, is the so-called underlying felony of burglary was not an underlying felony at all but was a constituent element of the principal offense. By statute capital murder in the Smith context had been defined as murder plus burglary. See Lambert v. State, 462 So.2d 308, 323 (Miss. 1984) (Robertson, J., dissenting in relevant part). The term "underlying felony" is a misnomer *313 which in retrospect ought to be jettisoned from capital murder parlance.

IV.

A.
The point in the end is that our legislature has exercised its prerogative to define crimes and fix punishments. See Roberson v. State, 501 So.2d 398, 401 (Miss. 1987); James v. State, 481 So.2d 805, 809 n. 1 (Miss. 1981); Winters v. State, 473 So.2d 452, 456 (Miss. 1985); Howell v. State, 300 So.2d 774, 780-81 (Miss. 1974). This is what it has done with the enactment of Section 97-3-19(2)(f). That section tortuously declares as "capital murder"
The killing of a human being without the authority of law by any means or any manner ... when done with or without any design to effect death, by a person engaged in the commission of the crime of felonious abuse and/or battery of a child in violation of subsection (2) of Section 97-5-39, or in any attempt to commit such felony.
The status of the victim as a child and the battery of the child are constituent elements of the single offense of capital murder the same as are "killing" and "without authority of law." The legislature having prescribed, among others, this definition of "capital murder," we are without authority to change it. Yet such a change is exactly what Appellant Faraga would have us accomplish in his argument regarding the merger doctrine.
The argument for the application of the merger doctrine here founders as a matter of statutory interpretation, not because the statutory provisions dealing with murder, on the one hand, and felonious child abuse, on the other, are intended to protect different societal interests. I regard rather strained logic that argues that different interests are protected by the statute prohibiting felonious child abuse, on the one hand, and that prohibiting felonious child killing, on the other. The "different societal interests" rationale is just as much hocus pocus as the merger doctrine. The statute is valid because the legislature has the prerogative to define crimes and fix punishments and, subject only to limitations imposed by federal and state constitutions, we are not at liberty to interfere. Armstead v. State, 503 So.2d 281, 284 (Miss. 1987). Suffice it to say that there is no known constitutional limitation upon a state's prerogative to define as a crime the killing of a human being while in the course of the act of felonious child abuse.

B.
Much of today's confusion has its source in the legislative draftsmanship  tortuous[2], as we have above labeled it  that has produced the present form of our capital murder statute. Section 97-3-19(2)(e) makes capital murder of killings that occur in the course of other serious felonies  kidnapping, rape, etc. These are "underlying felonies" which do not produce fatality, even when coldly committed. See Smith v. State, 499 So.2d at 754 (defendant, "after committing the burglary ... could have *314 withdrawn from the premises without attacking his victim"). Moreover, these "underlying felonies" contemplate acts by the defendant separate and distinct from the acts producing death. Smith, 499 So.2d at 753-54.
Section 97-3-19(2)(f), with which we are concerned today, is drafted in the same form as subsection (2)(e). But here the similarity ends. Unlike burglary or kidnapping, felonious child abuse if severe enough may well result in the death of the child. A single blow may be sufficient. Miss. Code Ann. § 97-5-39(2) (Supp. 1986). The same act on the part of the defendant, the same blow striking the child, may constitute felonious child abuse and capital murder. A single blow  the child abuse statute employs the word "strike", Miss. Code Ann. § 97-5-39(2) (Supp. 1986)  will, if it kills the child, by definition "mutilate, disfigure or destroy" the child. Thus seen, there is no underlying felony in subsection (2)(f).
The felonious abuse of a child which results in the death of the child is capital murder. The offense may result from a lone blow, a single shot. If the child lives, the offense is felonious child abuse. If the child dies, the crime becomes capital murder.
Subsection (2)(f) capital murder, correctly construed, creates a status offense, like unto subsection (2)(a) which declares as capital murder the killing of a law enforcement officer in the line of duty. Subsection (2)(f) declares as capital murder the killing of a child, the definition of "child" to be gleaned from the felonious child abuse statute, Section 97-5-39 (Supp. 1986).

V.
Merger does occur here, but not in the way Faraga argues. The State could not now prosecute Faraga for non-capital murder, for felonious child abuse, or for any other assaultive crime.[3] None of these lesser offenses has under our positive criminal law in the context of today's facts legal status as a separate crime. Each of these lesser offenses is merged into the offense of capital murder for which Faraga has been tried, convicted and sentenced and I am confident no member of the Court by asserting to the majority opinion intends otherwise.
These points made, I otherwise concur in the opinion of the Court and in the judgment it announces.
GRIFFIN, J., joins in this opinion.
NOTES
[1] The jury found Faraga "intended that the killing of the child in question take place" in compliance with Miss. Code Ann. § 99-19-101(3)(a) (Supp. 1985) and Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).
[1] As a practical matter, such cases are often tried so that the jury is presented a principal offense and one or more lesser included offenses. See, e.g., Harper v. State, 478 So.2d 1017, 1021 (Miss. 1985); Lee v. State, 469 So.2d 1225, 1230-31 (Miss. 1985). Cf. Johnson v. State, 512 So.2d 1246, 1251 (Miss. 1987); Scott v. State, 60 Miss. 268, 269 (1882).
[2] Far more passion than reason has been brought to bear in the drafting and amending of our capital murder statute. In their zeal to extend exposure to the death penalty, the draftsmen have produced several capital crimes I find quite bizarre. The prize, of course, must be awarded Section 97-3-19(2)(e) when it makes capital murder

"the killing of a human being, etc., ... when done... by any person engaged in the commission of . .. nonconsensual unnatural intercourse with mankind,"
a definition which might well encompass the conduct of several of this state's political leaders in years past but I am not sure what else.
In today's context I note subsection (2)(f)'s declaration that felonious child killing is capital murder when consummated, "or in any attempt to commit such felony." The problem is the legislative tracking of the format of the quite different subsection (2)(e). While it might make sense to declare capital murder a felonious killing in the course of an attempted rape, the same may not be said child killing in the course of attempted child abuse. How does one kill a child without going far beyond the mere attempt? Or is the statute merely redundant: killing a child while attempting to kill that child is capital murder? Though English teachers would cringe at this draftsmanship, here again we must exhalt substance over word usage and not allow linguistic ineptitude to thwart the sovereign's command for criminal justice. Cf. Henderson v. State, 445 So.2d 1364 (Miss. 1984).
[3] For example, Frank Joseph Wetz could not be prosecuted for felonious child abuse, now that he has been finally convicted of the murder of his daughter. See Wetz v. State, 503 So.2d 803 (Miss. 1987). This conclusion and that stated above flow independently from this state's Double Jeopardy Clause, Miss. Const. Art. 3, § 22 (1890) and from our common law merger doctrine.