# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-KA-00772-COA

JOSEPH SNOW SCHROTZ                                 APPELLANT

v.

STATE OF MISSISSIPPI                                   APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 03/19/2014 |
| TRIAL JUDGE: | HON. ROGER T. CLARK |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES PHILLIP BROADHEAD |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | JOEL SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF MISDEMEANOR TRESPASS AND SENTENCED TO SIX MONTHS IN THE CUSTODY OF THE HARRISON COUNTY SHERIFF'S DEPARTMENT, AND FELONY FAILURE TO STOP A MOTOR VEHICLE, AND SENTENCED AS A HABITUAL OFFENDER TO FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITHOUT THE POSSIBILITY OF PROBATION OR PAROLE, WITH THE SENTENCES TO RUN CONSECUTIVELY |
| DISPOSITION: | AFFIRMED - 06/23/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., ISHEE AND CARLTON, JJ.**

**LEE, C.J., FOR THE COURT:**

## PROCEDURAL HISTORY

¶1. Joseph Snow Schrotz was convicted of felony failure to stop a motor vehicle pursuant to the signal of a law-enforcement officer (felony failure to stop a motor vehicle) and willful or malicious trespass (misdemeanor trespass). For the felony-failure-to-stop conviction, Schrotz was sentenced as a habitual offender to five years in the custody of the Mississippi Department of Corrections. For the misdemeanor trespass, Schrotz was sentenced to serve six months in the custody of the Harrison County Sheriff's Department. Both sentences were ordered to be served consecutively. Schrotz filed post-trial motions, which were denied by the trial court. Schrotz now appeals and asserts ineffective assistance of counsel.

## FACTS

¶2. Around 11 a.m. on May 27, 2013, Harrison County Sheriff's Deputy Brandon Hendry was patrolling Interstate 10 when his license-plate reader alerted him that the 2009 white Dodge Caliber he observed had been reported stolen. Deputy Hendry activated his lights and siren and attempted to stop the vehicle. When the driver of the vehicle refused to stop, a chase ensued, reaching speeds of up to 128 miles per hour. The driver of the vehicle ran stop signs and swerved into the opposite lane. He passed vehicles when passing was prohibited, and took curves at high rates of speed. Meanwhile, a number of Harrison County sheriff's deputies had constructed a roadblock with spike strips. When the driver of the vehicle saw the roadblock, he slowed the vehicle, jumped out, and ran into the woods.

¶3. During the course of the pursuit, Deputy Hendry had observed the driver manipulating something in the front passenger seat. Concerned for his safety, he stopped his patrol car

one-hundred yards behind the point at which the driver of the vehicle had jumped out, and cautiously proceeded on foot. Knowing there was a canine team in the area that would be used to search for the driver, Deputy Hendry stopped his pursuit at the edge of the woods to avoid disturbing the driver's scent. Deputy Hendry gave a description of the driver of the vehicle as having a "slim build" and being "either [a] Hispanic male or [a] very light[-]skinned African-American male [wearing a] light T-shirt [] and blue jeans." Sergeant Bruce Carver, who was behind Deputy Hendry for the duration of the car chase, also testified that the driver was wearing dark pants and a "[l]ight[-]colored, white T-shirt."

¶4. The vehicle, which was still in gear, came to rest at a bridge. Three weapons were found in the vehicle, including an AR-15. A manhunt ensued, involving over twenty sheriff's deputies and several canine teams. Residents in the area were apprised of the situation and warned to keep the doors to their houses and vehicles locked.

¶5. The next morning, around 10 or 11 a.m., while Sergeant Carver and Mississippi Bureau of Narcotics Agent Brian Sullivan were waiting for a helicopter and four-wheelers to arrive, resident Drew Smith approached and told Sergeant Carver that his home security alarm had been triggered and asked him to come search his home. Smith had left some work materials on the porch that morning, and had come home to retrieve them. The alarm was a silent alarm. He could see through the window of his front door that the light on the security alarm key pad was blinking, which meant the alarm had been triggered. Sergeant Carver, Agent Sullivan, and Smith walked around the house, checking the windows and doors for signs of a break-in. Unable to find a breached point of entry, Sergeant Carver and

Smith entered the home. Agent Sullivan remained outside.

¶6.     Sergeant Carver and Smith began a search of the home. When they reached Smith's daughter's bedroom, Smith looked into his daughter's bathroom, and saw someone in the shower. The person in the shower was wearing Smith's camouflage shirt. Smith motioned to Sergeant Carver that he had seen something. Concerned about Smith's safety, Sergeant Carver quickly escorted Smith back outside. With Smith back outside, Sergeant Carver and Agent Sullivan approached the front door. Agent Sullivan attempted to call the subject out of the house. When there was no response, Agent Sullivan went around the back of the house to watch for the subject, in case he tried to run, and waited for backup. Then he heard Sergeant Carver giving commands. Agent Sullivan ran back to the front door. The subject was coming from the hallway into the living room. He had his hands up. When he was ordered to get down on the ground, he refused. He continued to walk toward the officers. Both officers holstered their weapons and wrestled the man to the ground. After a brief struggle, they were able to handcuff him. Agent Sullivan performed a pat down on the subject and recovered a key from his pocket that Smith said belonged to his wife's car. Smith testified that it was his wife's spare key, and that the subject had removed the key from a key ring.

¶7.     At trial, Sergeant Carver identified Schrotz as the man he arrested, and testified that he was similar in build, skin tone, and hair color as to the man who ran into the woods behind Smith's house the day before the arrest. Smith also identified Schrotz as the man who was arrested that day.

4

¶8.    Schrotz was indicted on four counts as a habitual offender – Count I, receiving stolen property; Count II, failure to stop a motor vehicle; Count III, possession of stolen firearms; and Count IV, burglary of a dwelling. The State dropped Counts I and III and proceeded to trial on counts II and IV. Pretrial, the trial court heard motions in limine. One of Schrotz's attorneys, Angela Blackwell, argued that evidence regarding Counts I and III should be suppressed because it was irrelevant to the counts being pursued and was more prejudicial than probative. More specifically, she argued that evidence that the vehicle was stolen, and that there were guns in the vehicle, should be suppressed. The trial court granted the motions, with Blackwell agreeing to stipulate that Deputy Hendry had reasonable suspicion and probable cause to believe a felony had been committed by the driver of the 2009 white Dodge Caliber, and that Deputy Hendry, in an attempt to stop the vehicle, activated his flashing lights and audible siren.

## DISCUSSION

¶9.    Schrotz argues that both Blackwell and his other attorney, Glenn Rishel, were ineffective because they failed to object to the wording of the stipulations that placed him behind the wheel of the white 2009 Dodge Caliber, and that this amounted to the functional equivalent of a guilty plea. He argues that his trial counsel's performance was deficient in that they failed to subject the State's case to meaningful adversarial testing by conceding the identity of the driver. The State argues that this concession was part of a trial strategy to admit to a lesser offense, find favor with the jury, and be acquitted of or found guilty of a lesser offense of a greater charge. The State argues that defense counsel's theory of the case

5

was that Schrotz did indeed try to evade law enforcement, but that he did not commit a burglary because he did not have the requisite intent to steal personal property in the dwelling; that he was merely hiding from the manhunt that was underway.

¶10. The stipulations, signed by Schrotz and counsel for both sides, were read into the record, and state as follows:

STIPULATION

COME NOW the Defendant, Joseph Snow Schrotz, and his attorney, and the Assistant District Attorney who prosecutes for the State, and for all purposes in this case stipulate that on March 27, 2013, Deputy Brandon Hendry, while on duty for the Harrison County Sheriff[']s] Department, had reasonable suspicion and probable cause that a Felony had been committed by the Defendant, who was driving a white 2009 Dodge Caliber with the Virginia license plate number JZS3930 and that a traffic stop should be performed.

It is further agreed that this stipulation and this document may be admitted into evidence at any hearing or trial in this case without the necessity of any testimony concerning this stipulation or document or any further or other authentication and shall be considered by the Court and Jury just as any other evidence admitted may be considered.

STIPULATION

COME NOW the Defendant, Joseph Snow Schrotz, and his attorney, and the Assistant District Attorney who prosecutes for the State, and for all purposes in this case stipulate that on March 27, 2013, Deputy Brandon Hendry, while on duty for the Harrison County Sheriff[']s] Department, attempted to perform a legal traffic stop of the Defendant, who was driving a white 2009 Dodge Caliber with Virginia license plate number JZS3930[,] and while attempting to perform said stop[,] . . . Deputy Brandon Hendry's patrol car had on its flashing lights and audible siren. These flashing lights and audible siren could be heard and seen by motorists.

It is further agreed that this stipulation and this document may be admitted into evidence at any hearing or trial in this case without the necessity of any testimony concerning this stipulation or document or any further or other authentication and shall be considered by the Court and Jury just as any other

6

evidence admitted may be considered.

Rishel further acknowledged that Schrotz was driving the vehicle when he argued his motion to exclude latent fingerprint evidence. That exchange was as follows:

THE COURT: Well, now is this all a big to do over nothing[?] . . . [B]ecause there is a stipulation that the defendant was driving the car when the initial officer started chasing him. So it's already been admitted and the evidence is in front of the jury that he was driving the car.

MR. RISHEL: I think [Y]our Honor has hit upon a real truism, if you will.

And finally, during closing argument, Blackwell stated:

As far as the evasion, the failing to stop a motor vehicle, you will have the video. You will have this very nice printout. Watch the video, use your common sense. If you see based on that video there was a reckless disregard for people and property, find him guilty of the felony. But if you don't, it's a misdemeanor and he should be found guilty of a misdemeanor, not a felony.

And ladies and gentlemen, I'm not going to dramatize it. I'm certainly not going to stand up here and narrate to you what happened. You have eyes, you have common sense. Watch the video and then decide. It's simple. It's easy. It's common sense. And everything about these fingerprints, dog and pony show. That's what it is. He was in the car.

Now let's talk about this burglary because I have had a problem with this burglary charge since this case came to my desk. I've had a problem with it because I have looked at this case, and you've heard all the evidence here today. And you look at the circumstances because you can consider that whenever you decide whether or not a burglary actually took place.

The circumstances were this 22-year-old boy was out in the woods. He had run from the police, and he was scared. There was a small army of Harrison County Sheriff's Department officers looking for him with the helicopter, the dogs, the ATV. Everybody was looking for him. He broke into a house. He went inside the house to hide. Not to steal, but to hide. That's why he didn't leave. That's why he was in a shower. He was hiding from the police.

7

One of the elements that the [S]tate has to prove to you beyond a reasonable doubt is that he broke in this house, which I don't think they can prove he actually broke into. They have no point of entry. We have no idea how this man ended up inside that house. He could have walked through an open door. We have no idea. No pry marks, no broken windows, nothing. If there were, the police would have taken pictures of it. There were no fingerprints found. They have no clue, and that's a lack of evidence, an absolute lack of evidence. And that's a reasonable doubt. That is a reasonable doubt.

As far as whether or not the underlying offense being he had to enter this house with the intent to steal personal property located inside that house. Well, guess what, not one person got on that witness stand and said that shirt or them keys were inside that house. Not one person. That pretty shirt right here that they keep showing you could have been hanging on a line drying out in the backyard. We don't know. Nobody told us. That could have been taken outside. My husband Robert, he leaves keys in the door all the time. I want to kill him. He leaves his keys in the door. Maybe the key was outside. It was a spare. There was no vehicle there. Wasn't going to steal a car. He wasn't. It is what it is. That is a reasonable doubt.

If you find there was a reasonable doubt, he is not guilty of burglary, he is guilty of trespassing. [Y]ou should find him guilty of trespassing.

¶11. In *Sandlin v. State*, 156 So. 3d 813, 819 (¶20) (Miss. 2013), the supreme court succinctly stated when we may address an ineffective-assistance-of-counsel claim on direct appeal:

Because the Court is limited to the trial record on direct appeal, issues of ineffective assistance of counsel are more appropriate in a motion for post-conviction relief. *Parker v. State*, 30 So. 3d 1222, 1232 (¶36) (Miss. 2010). However, the Court may address the claims on direct appeal if the issues are based on facts fully apparent from the record. *Id*. If the record is not sufficient to address the claims on direct appeal, the Court should dismiss the claims without prejudice, preserving the defendant's right to raise the claims later in a properly filed motion for post-conviction relief. *Id*.

Because we find that Schrotz's claim is based on facts fully apparent from the record, we will address the merit of his claim.

¶12. In order to succeed on a claim of ineffective assistance of counsel, Schrotz must prove that his trial counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Id*. at 688. Once a deficient performance is shown, Schrotz "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

¶13. No attorney should concede to a jury that his client is guilty of the crime charged in the indictment. *Faraga v. State*, 514 So. 2d 295, 308 (Miss. 1987). "When proof of certain facts is overwhelming, however, an attorney may find it strategically prudent to concede such facts while still denying that his client is guilty of the crime charged in the indictment." *Id*. In *Faraga*, Faraga's attorney conceded Faraga was guilty of simple murder, a lesser-included offense of capital murder, the crime for which Faraga was charged. *Id*. The supreme court concluded that the attorney's candor during the guilt phase may have helped Faraga during the sentencing phase. *Id*. The court stated that "[a]n attorney who, while sincerely trying to help his client, at the same time is open and honest with the jury is more likely to receive a sympathetic and open ear in his other arguments." *Id*. The court ultimately held that the attorney's concession was "the product of a tactical decision and the best argument he could make given the circumstances[.]" *Id.*

¶14. *Faraga* involved one count, and the defense's admitting to the lesser-included offense

9

for which a jury instruction was given. In *Williams v. State*, 791 So. 2d 895, 899 (¶14) (Miss. Ct. App. 2001), this Court addressed whether admitting to one count to avoid conviction on another count was sound trial strategy. Williams was facing possible convictions for both aggravated assault and kidnapping. *Id*. at (¶13). The maximum sentence for aggravated assault was twenty years, and the maximum sentence for kidnapping was thirty years. *Id*. During trial, a videotape of the shooting that constituted the aggravated assault was played for the jury. *Id*. at (¶14). This Court found that "defense counsel's statements to the jury, acknowledging the existence of evidence that was essentially beyond dispute and for which the defense could offer no exculpatory explanation," did not amount to ineffective assistance of counsel. *Id*. at 900 (¶16). Applying the reasoning in *Faraga*, we found that "viable trial strategy existed [where defense counsel attempted] to win some measure of favor with the jury by candidly conceding the overwhelming nature of the evidence of guilt" on the aggravated-assault charge in hopes that "the jury, in reaction to such a forthright concession, might give more credence to Williams's assertion that the automobile journey was not to kidnap [the victim] but to get her to a hospital to receive needed medical treatment." *Id*. at 899 (¶14). We noted in *Williams* that the purpose for such a concession was to try to lessen the defendant's maximum potential punishment.

¶15.    Schrotz was accused of violating Mississippi Code Annotated section 97-9-72(2) (Rev. 2014). Section 97-9-72 reads in pertinent part:

> (1) The driver of a motor vehicle who is given a visible or audible signal by a law enforcement officer by hand, voice, emergency light or siren directing the driver to bring his motor vehicle to a stop when such signal is given by a law enforcement officer acting in the lawful performance of duty who has a

10

reasonable suspicion to believe that the driver in question has committed a crime, and who willfully fails to obey such direction shall be guilty of a misdemeanor, and upon conviction shall be punished by a fine not to exceed One Thousand Dollars ($1,000.00) or imprisoned in the county jail for a term not to exceed six (6) months, or both.

(2) Any person who is guilty of violating subsection (1) of this section by operating a motor vehicle in such a manner as to indicate a reckless or willful disregard for the safety of persons or property, or who so operates a motor vehicle in a manner manifesting extreme indifference to the value of human life, shall be guilty of a felony, and upon conviction thereof, shall be punished by a fine not to exceed Five Thousand Dollars ($5,000.00), or by commitment to the custody of the Mississippi Department of Corrections for not more than five (5) years, or both.

¶16. Evidence of failure to stop a motor vehicle was overwhelming. There was a video recording that the crime of failure to stop a motor vehicle had occurred, along with the testimony of the police officer. There was evidence that the vehicle was traveling at high rates of speed, passing vehicles when passing was prohibited, and running stop signs. To protect their client from prejudice, defense counsel stipulated to the fact that the officer had reasonable cause to believe that a felony had occurred. Because the video recording contained audio that the vehicle was stolen, they also stipulated that the patrol car's sirens and lights were on. The State had to prove both the identity of the driver and that the driver operated the motor vehicle in such a manner that it evinced a reckless and willful disregard for the safety of others. Because the video recording failed to record the end of the chase, the heaviest burden was for the State to prove the identity of the driver. The State had to prove the person found in the shower of Smith's home was the driver of the vehicle. The State did this through fingerprint evidence, and through the testimony of Sergeant Carver that the person found in Smith's home was of similar build, skin tone, and hair color as to the

11

person who fled from the vehicle and into the woods. A review of the record reveals that defense counsel effectively cross-examined the State's witnesses regarding the fingerprint evidence, and that a reasonable juror could have found that Schrotz, who was identified as being arrested in Smith's home, was the driver of the vehicle. We also note that a lesser-included-offense instruction for misdemeanor failure to stop a motor vehicle was given. The one element that defense counsel did not concede to the jury was that Schrotz acted with reckless or willful disregard for the safety of others. Schrotz admitted to the lesser-included offense of misdemeanor failure to stop a motor vehicle, but not felony failure to stop a motor vehicle as charged in the indictment.

¶17. While Schrotz argues that conceding his identity as the driver was the functional equivalent of a guilty plea to the charge indicted, given the video recording and Officer Hendry's testimony, it is evident from the record that admitting guilt to misdemeanor failure to stop a motor vehicle was part of a larger trial strategy. Schrotz faced possible conviction for both felony failure to stop a motor vehicle and burglary of a dwelling. As a habitual offender, he was to receive the maximum sentence for each felony prescribed by law, and each sentence was to be served day-for-day, with no possibility of parole. Miss. Code Ann. § 99-19-81 (Supp. 2014). The maximum sentence for felony failure to stop a motor vehicle is five years, and the maximum sentence for burglary of a dwelling is twenty-five years. Miss. Code Ann. §§ 97-9-72(2), 97-17-23(1) (Rev. 2014). It is evident from reading defense counsel's closing argument that she was conceding to the driver's identity to explain Schrotz's presence in Smith's home, and the lack of his intent to steal personal property

12

therein, an element of the offense of burglary. Miss. Code Ann. § 97-17-23(1). As in *Williams*, defense counsel conceded the identity of the driver to win favor with the jury in the hopes that such a concession would lend credence to Schrotz's assertion that he was not in Smith's home to steal, but was hiding from the manhunt that was underway. The trial strategy worked. Schrotz was found guilty of felony failure to stop a motor vehicle and trespass. Instead of being sentenced to twenty-five years for burglary of a dwelling, he received the maximum sentence for the crime of trespass, which is six months. Miss. Code Ann. § 97-17-87(1) (Rev. 2014). Given the circumstances, we find that it was a reasonable trial strategy to admit guilt to misdemeanor failure to stop a motor vehicle in an attempt to avoid conviction on the burglary-of-a-dwelling charge. Thus, we cannot find Schrotz's counsel ineffective.

¶18. **THE JUDGMENT OF THE HARRISON COUNTY CIRCUIT COURT OF CONVICTION OF MISDEMEANOR TRESPASS AND SENTENCE OF SIX MONTHS IN THE CUSTODY OF THE HARRISON COUNTY SHERIFF'S DEPARTMENT, AND FELONY FAILURE TO STOP A MOTOR VEHICLE, AND SENTENCE AS A HABITUAL OFFENDER OF FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITHOUT THE POSSIBILITY OF PROBATION OR PAROLE, WITH THE SENTENCES TO RUN CONSECUTIVELY, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HARRISON COUNTY.**

**IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, ROBERTS, CARLTON, MAXWELL, FAIR AND JAMES, JJ., CONCUR.**

13