# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-KA-00130-COA

**OREN JOSEPH LEWIS**                                                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                    **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/20/2017 |
| TRIAL JUDGE: | HON. LAWRENCE PAUL BOURGEOIS JR. |
| COURT FROM WHICH APPEALED: | HANCOCK COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | CYNTHIA ANN STEWART |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MATTHEW WYATT WALTON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 10/29/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE J. WILSON, P.J., TINDELL AND LAWRENCE, JJ.

### TINDELL, J., FOR THE COURT:

¶1.     On June 16, 2017, a jury found Oren Lewis guilty of capital murder for the death of his two-year-old daughter, Ma'Leah Grace Bush.  The Hancock County Circuit Court sentenced Lewis to life imprisonment without eligibility for parole.  On June 23, 2017, Lewis filed an unsuccessful post-trial motion requesting an acquittal or, alternatively, a new trial. Lewis now appeals to this Court.  Finding no error, we affirm Lewis's conviction and sentence.

### FACTS AND PROCEDURAL HISTORY

¶2.     On May, 21, 2015, Lewis was indicted for capital murder for Ma'Leah's death. Lewis's jury trial was held June 13–15, 2017.  During trial, the jury heard testimony from

numerous witnesses for the State and Lewis. The facts leading up to the incident primarily stemmed from the testimony of Lewis, Amanda Proulx (Lewis's wife), Jalen Walker (Lewis's son), Michaela Walker (Lewis's step-daughter), and Dena Lohman (Amanda's friend).

¶3. Prior to his conviction, Lewis testified that he was a special-education teacher at North Gulfport Middle School. Lewis and Amanda lived in Waveland, Mississippi, with four children—Jalen and Bralen (Lewis and Amanda's seven-year-old and three-month-old sons), Michaela (Amanda's nine-year-old daughter), and Ma'Leah, who was two years old at that time. Amanda testified that she worked the night shift at Ochsner's Hospital in Slidell, Louisiana, leaving Lewis responsible for taking care of the four children while she was at work.

¶4. Amanda and Dena testified that on the morning of August 24, 2013, they both went to Biloxi for a girls' day, leaving Lewis with Amanda's and Dena's children. When Amanda and Dena returned that evening, Dena took Jalen, Michaela, and Ma'Leah to spend the night at her house. Dena testified that at this point, Ma'Leah was acting normally and was excited to spend time with Michaela and Dena's daughter, Allie.

¶5. Dena stated that she left Lewis and Amanda's home and took the children to McDonald's to eat. After dinner, Dena took the children back to her house, where Jaylen played with Dena's son, Caden, and Allie, Michaela, and Ma'Leah played "Just Dance" and polished each other's toenails. Dena testified that Ma'Leah was dancing, walking around, and was very happy all night. Dena put the children to bed, and Ma'Leah slept in Allie's

2

room with Allie and Michaela.

¶6.     Meanwhile, that same night, Amanda and Lewis both testified that they went to a casino in Gulfport while a babysitter took care of Bralen. The couple returned home between 2 a.m. and 4 a.m. on Sunday, August 25, 2013, the day of the incident. Bralen woke up crying around 6 a.m., and Amanda fed him before returning to sleep. When Bralen woke up again, around 8 a.m., Lewis got up with him and cared for him the rest of the day while Amanda rested for work.

¶7.     That Sunday morning, Dena testified that she took all of the children to church. Ma'Leah was very well-behaved at church and sat near Dena during the service. Dena took Michaela and Allie to dance practice and took Jalen and Ma'Leah back home around 2:30 p.m. At the time, Amanda recalled Ma'Leah walking, talking, and acting normally. Amanda testified that the last time she saw Ma'Leah before the incident in question was around 6:15 p.m., just before leaving their house for work. Again, Ma'Leah appeared to be normal and was eating a bag of chips just as Amanda left the house.

¶8.     Lewis testified that after Amanda left for work, he was in charge of making meals and taking care of Michaela, Jalen, Bralen, and Ma'Leah. Lewis stated that Ma'Leah was very tired and would not eat while Bralen—a newborn—was "inconsolable" that night. Lewis also testified that Ma'Leah refused to eat that night, and after she spit out her food, he cleaned her up. At trial, Amanda read a series of text messages to the jury that were exchanged between her and Lewis around 8:10 p.m. that night. In the messages, Lewis expressed frustration with taking care of the children, specifically Bralen, and Amanda

attempted to calm Lewis down. Amanda also testified that she called Lewis around 10 p.m. to check on him. Lewis told Amanda that Bralen had finally fallen asleep but did not eat much that night. Amanda warned Lewis that he should be prepared to be up that night with Bralen because he would be hungry. Amanda testified that she and Lewis never spoke about Ma'Leah during these exchanges, and to her knowledge, Ma'Leah was fine at this point in the night.

¶9.     At trial, Lewis, Michaela, and Jalen all testified to three different versions of the events leading up to Ma'Leah's death. Immediately prior to her testimony, Michaela informed a victim's coordinator for the State that her mother, Amanda, had asked her to tell the jury that she did not remember anything that happened the night of Ma'Leah's death. The State informed the circuit court that Michaela was visibly upset and crying. However, Michaela proceeded with her testimony.

¶10.    Michaela testified that, after her mother went to work, Lewis was the only adult left to watch Jalen, Bralen, Ma'Leah, and her. That night, Michaela testified that she and Jalen watched television in Jalen's room. Michaela went to take a bath but heard a loud noise that sounded like thunder coming from the living room. Michaela then testified that she went back into Jalen's room. Soon after, Michaela and Jalen heard three "slapping noises," again coming from the living room. After hearing the slapping noises, Michaela went into the living room and saw only Lewis and Ma'Leah. Michaela testified that Ma'Leah was crying. Lewis turned to Michaela and said, "I didn't touch her." Michaela went back to Jalen's room and continued watching television.

4

¶11.　Michaela testified that, some time later, she went into the living room again to put Ma'Leah to bed. Michaela picked Ma'Leah up from the couch and noticed a "knot on her head." Michaela took Ma'Leah to her room and placed Ma'Leah on her (Michaela's) bed before going back to Jalen's room. Michaela testified that she and Jalen were sitting on Jalen's bed watching television and could see out of Jalen's bedroom door into the hallway. Sometime later, Michaela and Jalen fell asleep. Michaela was later awoken by Lewis's loud footsteps and looked out into the hallway. In the shadows on the wall across from her room, Michaela saw Lewis pick Ma'Leah up and "toss" her onto Michaela's bed twice. Michaela testified that she fell asleep, and she was again awoken by Lewis's footsteps. Michaela again looked out into the hallway and saw Lewis, who was now walking down the hallway toward the back of the house. Michaela stated that Lewis was holding Ma'Leah's body out and away from him. Michaela testified that she fell asleep one more time and was awoken by strangers asking her questions and telling her that Ma'Leah had been hurt.

¶12.　Jalen's testimony about that night differed slightly. Jalen testified that he and Michaela were watching television in his room when they heard a loud "boom" coming from Michaela's room. Jalen testified that he and Michaela both went to the bedroom and that Lewis came from the living room to the bedroom. Jalen further testified that he and Michaela saw Ma'Leah lying on the ground, and unlike Lewis's testimony, Jalen said that he did not see any part of her body caught in Michaela's trundle bed. Jalen then remembered going to the hospital in New Orleans after Ma'Leah had been hurt.

¶13.　Lewis recalled a different set of events surrounding Ma'Leah's death. Lewis testified

5

that he gave Ma'Leah a bath and dropped a bottle of shampoo, which made the first "boom" that Jalen and Michaela heard. Lewis testified that Jalen and Michaela came in the bathroom to ask about the "boom," and Lewis told them that he had dropped the shampoo bottle. Lewis testified that after Ma'Leah's bath, Jalen and Michaela watched television at the back of the house while he sat in the living room on the couch with Bralen and Ma'Leah. Lewis said that at some point later in the evening, Michaela came and put Ma'Leah to bed. But in a separate statement made on the night of the investigation, Lewis told investigators that *he* actually put Ma'Leah to bed. Lewis testified that Ma'Leah slept in Michaela's trundle bed, which was approximately two feet from the ground in Michaela's bedroom.

¶14.    Lewis then testified that he put Bralen in his crib and went to bed himself. Lewis stated that he heard the second "boom" and went into Michaela's room to check on Ma'Leah. Lewis testified that Jalen and Michaela were asleep in Jalen's room and never came into Michaela's room to see what had happened, as they testified. Lewis testified that when he came to check on Ma'Leah, he saw her right foot caught in the wire of Michaela's trundle bed and her head and body on the carpeted floor next to the bed. After calling Ma'Leah's name, Lewis stated that she was unresponsive. He then called 911 and placed Ma'Leah on the living-room couch until an ambulance arrived. When asked about Jalen's and Michaela's versions of the events, Lewis responded that their accounts were "[f]abrication."

¶15.    During trial, the State offered a number of medical and law-enforcement witnesses to testify as to the aftermath of Ma'Leah's injury. Allison Jacobson, a 911 dispatcher, testified that she received the call from Lewis the night of the incident stating that Ma'Leah

6

had fallen from her bed. Benjamin Bowden, an investigating officer, testified that he was dispatched to Lewis's home following the 911 call. Bowden arrived at Lewis's house and saw Ma'Leah lying on the couch in the living room. Ma'Leah initially appeared to be deceased, but then Bowden heard a gurgling sound and saw Ma'Leah struggling to breathe. Bowden testified that he observed "a large indentation and some bruising [and] a large pooling of blood underneath the skin on the left side of her head." Bowden also testified that Lewis, who appeared to be calm, informed Bowden that Ma'Leah had fallen out of the bed in Michaela's room. Bowden then surveyed Michaela's room and observed that the bed was above carpeted floor. Bowden testified that he notified an investigator from the Waveland Police Department and remained at the house until someone was called to look after Michaela, Jalen, and Bralen.

¶16. David Allen, the police chief at the time of the incident, testified to investigating Lewis's house on August 26, 2013. Because Lewis claimed that Ma'Leah had fallen from the bed, Allen and another investigator inspected Michaela's room and bed. Allen testified that the house was raised, meaning that the floor under Michaela's room was hollow and not a solid, concrete slab. Allen further testified that he took measurements of Michaela's bed. According to Allen, the length from the top of the highest part of the bed to the carpeted floor measured approximately 26 inches.

¶17. Kyle Carter, a paramedic who arrived at the scene, testified that Ma'Leah appeared to be unresponsive and had significant swelling on her head. Carter also testified to suctioning a significant amount of blood from Ma'Leah's mouth. Carter ultimately

7

transported Ma'Leah to Hancock Medical Center, stating that she was "cool to the touch."

¶18.   Martha Moraway, an emergency-room nurse who treated Ma'Leah the night of the incident, also testified at trial.  Moraway testified that Ma'Leah required ventilation upon arrival at Hancock Medical Center.  Moraway observed a large contusion on the left side of Ma'Leah's head, a small indention on the right side of her head, a small abrasion on her forehead, bruising on her arms and legs, and blood in her mouth.  Moraway also testified that Lewis told her in the emergency room that Ma'Leah had fallen from her bed.  However, Moraway testified that, from her observations, Ma'Leah's injuries were inconsistent with a child who had fallen from a bed.

¶19.   Dr. Edward Byrnes, Ma'Leah's treating emergency physician at Hancock Medical Center, testified at trial as an expert in emergency medicine.  Dr. Byrnes stated that Ma'Leah entered the hospital around 11:34 p.m. on the night of the incident. Dr. Byrnes examined Ma'Leah and testified that she suffered "significant multiple skull fractures" as well as a significant bleeding in the brain.  Dr. Byrnes testified that he had treated "a couple hundred" head injuries and that every year he treated 30–40 children whose injuries resulted from falling out of a bed.  In his expert opinion, Dr. Byrnes stated that Ma'Leah's injuries were inconsistent with a child who had just fallen 26 inches from a bed.  Dr. Byrnes further testified that Ma'Leah's injuries were consistent with non-accidental trauma.

¶20.   Around 3 a.m. on August 26, 2013, Ma'Leah was airlifted to the Children's Hospital in New Orleans and treated by a team of doctors.  That team included Dr. Jamie Jackson, a child-abuse pediatrician, who also testified at trial.  Dr. Jackson testified that because there

8

was suspected child abuse involved, she examined Ma'Leah and spoke with Lewis, Michaela, and Jalen. According to Dr. Jackson, Lewis told her that, after putting Ma'Leah to sleep, he heard "a boom boom" noise and found Ma'Leah unresponsive with her right foot stuck in the trundle bed. Upon interviewing Michaela and Jalen, however, Dr. Jackson became concerned. Dr. Jackson testified that the children's statements conflicted in such a way that it seemed as if someone was trying to influence their statements. Dr. Jackson also testified that Jalen stated that his sister told him "not to talk about things."

¶21. In treating Ma'Leah, Dr. Jackson testified that Ma'Leah sustained serious bruising around both ears, on the left side of her face and head, on her right knee and lower leg, and on her left shoulder. Dr. Jackson testified that the amount and specific locations of the bruising was not indicative of one incident of a child falling from her bed. Dr. Jackson stated that the ear bruising alone indicated that Ma'Leah had been physically abused. Dr. Jackson also testified that Ma'Leah sustained a complex skull fracture and multiple fractures to her vertebrae. Dr. Jackson explained that most "typical simple household falls" result in a single linear skull fracture or, in very rare occasions, two skull fractures. Ma'Leah's injuries, however, were severely complex and suggestive of a child being forcibly "slammed down directly onto [her] head," thereby fracturing the skull and "crunching" the vertebrae. Also, Dr. Jackson noted that Ma'Leah had extensive retinal hemorrhaging, or bleeding to the eyes, which "is almost exclusively seen with regard to abusive head traumas." Overall, Dr. Jackson concluded that Ma'Leah's injuries were not consistent with the history Lewis provided. Dr. Jackson testified that, in her expert opinion, the injuries were the result of

9

child abuse.

¶22. Dr. Alejandro Leon, Ma'Leah's pediatric ophthalmologist at the Children's Hospital of New Orleans, also testified at trial. Dr. Leon testified that, like Dr. Jackson, he too received a medical history on Ma'Leah stating that she had fallen from a trundle bed. Dr. Leon explained that most children who are injured from a low-height fall sustain little, if any, hemorrhaging to the eyes. However, Dr. Leon's examination showed that Ma'Leah had sustained extensive hemorrhaging in both eyes, which affected multiple layers of her eyes. Dr. Leon testified that, in his opinion, this type of damage to Ma'Leah's eyes was the result of non-accidental trauma or child abuse.

¶23. Another one of Lewis's defense theories at trial was that Ma'Leah's injuries resulted from Lewis rolling onto Ma'Leah while they were asleep on the couch and crushing her. Lewis's counsel questioned each doctor about the possibility of Ma'Leah sustaining a "crush injury," or an injury resulting from Lewis accidentally rolling onto Ma'Leah during sleep. Dr. Byrnes testified that, based upon his knowledge and experience, he had never heard of a parent rolling onto a child and the child sustaining Ma'Leah's severity of injuries. Dr. Jackson testified that children typically do not suffer such severe skull fractures in these situations but usually die from suffocation, which was not present with Ma'Leah. Dr. Leon also testified that when a parent rolls onto a child during sleep, the child likely suffers from a lack of oxygen. Dr. Leon explained, however, that a lack of oxygen would not cause the type of multi-layer hemorrhaging that Ma'Leah suffered.

¶24. As a result of her injuries, Ma'Leah died on August 27, 2013. On August 28, 2013,

10

Dr. Paul McGarry performed the autopsy, but he passed away prior to trial. Dr. Mark LeVaughn, the Chief Medical Examiner for the State of Mississippi, testified at trial as to Ma'Leah's autopsy report. Dr. LeVaughn testified that Ma'Leah sustained external bruising on the left ear, the left side of her head, the left shoulder, the right lower abdomen, the right side of her chest, the right foot, and the front of her left shin. Internally, Ma'Leah sustained a complex skull fracture and massive hemorrhaging to all levels of her brain, indicating "a tremendous amount of force" to the left side of Ma'Leah's head. Dr. LeVaughn testified that, had Ma'Leah fallen from her bed, at most, she would have suffered "some redness and abrasion" and possibly swelling. Dr. LeVaughn testified that Ma'Leah would "absolutely not" have sustained such severe injuries from falling out of bed. Dr. LeVaughn further testified that, to a reasonable degree of medical certainty, Ma'Leah's cause of death was a "blunt head injury," and her manner of death was "homicide."

¶25.    After hearing all the evidence, the jury convicted Lewis of capital murder. The circuit court sentenced Lewis to life imprisonment without eligibility for parole, pursuant to Mississippi Code Annotated section 97-3-21(3)(b) (Supp. 2013). Aggrieved, Lewis appeals and argues the following: (1) Mississippi Code Annotated section 97-5-39(2) (Supp. 1989) is unconstitutional; (2) The State violated Lewis's due-process rights by failing to include all the elements of felony child abuse in his capital-murder indictment; (3) The State violated Lewis's due-process rights by failing to include a statutory aggravating factor or a mens rea element in his capital-murder indictment; (4) The circuit court erred by denying his motion to dismiss and refusing a jury instruction regarding spoliation of evidence; (5) The circuit

11

court erred by admitting improper Rule 404(b) evidence; (6) The circuit court erred by denying Lewis's jury instruction on culpable negligence; (7) The circuit court erred by allowing the underlying felony of child abuse to be used as an aggravating factor for sentencing; and (8) The circuit court erred by imposing a life sentence without eligibility of parole without conducting a jury hearing.

## STANDARD OF REVIEW

¶26.     "When addressing a statute's constitutionality, we apply a de novo standard, bearing in mind (1) the strong presumption of constitutionality; (2) the challenging party's burden to prove the statute is unconstitutional beyond a reasonable doubt; and (3) all doubts are resolved in favor of the statute's validity." *Bosarge v. State*, 141 So. 3d 24, 27 (¶11) (Miss. Ct. App. 2014).  Additionally, we apply a de novo standard of review when a defendant challenges the legal sufficiency of an indictment.  *Beal v. State*, 86 So. 3d 887, 891 (¶9) (Miss. 2012). We also review de novo a circuit court's denial of a defendant's motion to dismiss and will not disturb the circuit court's findings unless they are manifestly wrong, clearly erroneous, or apply an erroneous legal standard. *McLendon v. State*, 945 So. 2d 372, 382 (¶26) (Miss. 2006).

¶27.     Admission of evidence under Mississippi Rule of Evidence 404(b) is reviewed for abuse of discretion. *Wilson v. State*, 149 So. 3d 544, 550 (¶22) (Miss. Ct. App. 2014).  We also review a circuit court's denial of proposed jury instructions for abuse of discretion. *Thompson v. State*, 119 So. 3d 1007, 1009 (¶3) (Miss. 2013).  Finally, "[s]entencing is [also] within the complete discretion of the [circuit] court and not subject to appellate review if it

is within the limits prescribed by statute. Unless the sentence is grossly disproportionate or not within the statutory limits, we will not disturb the sentence on appeal." *Cummings v. State*, 58 So. 3d 715, 719 (¶19) (Miss. Ct. App. 2011) (citation omitted).

**ANALYSIS**

### I.    Whether Mississippi Code Annotated section 97-5-39(2) (Supp. 1989) applies and whether the amended statute is unconstitutional.

¶28.    Lewis was convicted of capital murder while in the commission of felonious child abuse, pursuant to Mississippi Code Annotated section 97-3-19(2)(f) (Supp. 2013). The statute defines this type of capital murder as "[t]he killing of a human being without the authority of law by any means or in any manner . . . [w]hen done with or without any design to effect death, by any person engaged in the commission of the crime of felony child abuse and/or battery of a child in violation of subsection (2) of section 97-5-39." Miss. Code Ann. § 97-3-19(2)(e). Lewis argues that Section 97-5-39(2), which defines felony child abuse, is unconstitutionally vague as amended in 1989.

¶29.    We find this issue lacks merit for two reasons. First, Lewis cites to a specific felony-child-abuse statute that was no longer in effect at the time he committed the crime. Mississippi Code Annotated section 97-5-39(2) (Supp. 1989) read as follows:

> Any person who shall intentionally (a) burn any child, (b) torture any child, (c) except in self-defense or in order to prevent bodily harm to a third party, whip, strike or otherwise abuse or mutilate any child in such a manner as to cause serious bodily harm, shall be guilty of [felony] abuse and/or batter of a child.

This particular statute has been amended multiple times since 1989, with the most recent amendments being made in 2005 and 2013.

13

¶30. Second, as the State correctly addresses in its brief, the Mississippi Supreme Court held that the felony-child-abuse statute, as amended in 2005 under section 97-5-39(2)(a), was neither vague nor unconstitutional. *Rubenstein v. State*, 941 So. 2d 735, 772 (¶¶155-56) (Miss. 2006). Specifically, the supreme court held that the statute "provide[d] a person of ordinary intelligence [with] a reasonable opportunity to know what conduct is prohibited" and was therefore constitutional. *Id.* (internal quotation mark omitted). The supreme court further held that "the intentional act of murdering a child, by any manner or form, constitutes felony child abuse. . . ." *Id.* (citing *Brawner v. State*, 872 So. 2d 1, 16 (¶44) (Miss. 2004) (intentional quotation mark omitted). As the *Brawner* Court acknowledged, the legislative intent behind section 97-5-39(2) is to find serious child abusers guilty of capital murder in cases where the child dies as a result of the abuse. *Brawner*, 872 So. 2d at 16 (¶44). Therefore, "if the conduct fits the description of [felony] child abuse, and the child subsequently dies, it is capital murder." *Id.* (citing *Faraga v. State*, 514 So. 2d 295, 302 (Miss. 1987)).

¶31. Lewis's crime occurred in August 2013 under the most recent version of the felony child-abuse statute, as amended in July 2013 and published in the 2014 revision of the Code book. This version more specifically states:

> (2)     Any person shall be guilty of [felony] child abuse in the following circumstances:
>
> (a)     Whether bodily harm results or not, if the person shall intentionally, knowingly or recklessly:
>
> (i)     Burn any child;

14

(ii)     Physically torture any child;

(iii)    Strangle, choke, smother or in any way interfere with any child's breathing;

(iv)    Poison a child;

(v)    Starve a child of nourishments needed to sustain life or growth;

(vi)    Use any type of deadly weapon upon any child;

(b)    If some bodily harm to any child actually occurs, and if the person shall intentionally, knowingly, or recklessly:

(i)    Throw, kick, bite, or cut any child;

(ii)    Strike a child under the age of fourteen (14) about the face or head with a closed fist;

(iii)    Strike a child under the age of five (5) in the face or head;

(iv)    Kick, bite, cut or strike a child's genitals; circumcision of a male child is not a violation under this subparagraph (iv);

(c)    If serious bodily harm to any child actually occurs, and if the person shall intentionally, knowingly or recklessly:

(i)    Strike any child on the face or head;

(ii)    Disfigure or scar any child;

(iii)    Whip, strike, or otherwise abuse any child;

. . . .

(e)    For the purposes of this subsection (2), "bodily harm" means any bodily injury to a child and includes, but is not limited to, bruising, bleeding, lacerations, soft tissue swelling, and external or internal swelling of any body organ.

(f) For the purposes of this subsection (2), "serious bodily harm" means any serious bodily injury to a child and includes, but is not limited to, the fracture of a bone, permanent disfigurement, permanent scarring, or any internal bleeding or internal trauma to any organ, any brain damage, any injury to the eye or ear of a child or other vital organ, and impairment of any bodily function.

Miss. Code Ann. § 97-5-39(2) (Supp. 2013).

¶32. Upon review, the current statute is more detailed and specific than its predecessor, which the supreme court upheld as constitutional. *See Rubenstein*, 941 So. 2d at 772 (¶¶155-56). Furthermore, Lewis does not challenge the current statute but rather a version of the statute that was no longer in place when he committed the crime. After a de novo review, we therefore find this issue to be without merit.

II. **Whether the indictment must include all of the elements of the underlying felony.**

¶33. Lewis next argues that the State violated his due process rights by failing to set forth the elements of felony child abuse in addition to the elements of capital murder in his indictment. Defendants enjoy the right to be sufficiently informed of the nature and cause of accusations against him. Miss. Const. Art. 3 § 26; *see also* U.S. Const. Amend. VI. "The purpose of an indictment is to furnish the defendants with notice and a reasonable description of the charges against him so that he may prepare his defense." *Goff v. State*, 14 So. 3d 625, 665 (¶175) (Miss. 2009). Accordingly, "[a]n indictment is required only to have a clear and concise statement of the elements of the crime with which the defendant is charged." *Id*.

¶34. In capital murder cases, however, there is no requirement that the State set forth the elements of the underlying felony. "[U]nless the underlying felony is burglary, the

16

underlying felony that elevates the crime to capital murder must be identified in the indictment along with the section and subsection of the statute under which the defendant is being charged." *Baptiste v. State*, 121 So. 3d 808, 836 (¶43) (Miss. 2013) (citing to *Goff*, 14 So. 3d at 665 (¶176)). "No further detail is required." *Id*.

¶35. Lewis's indictment states that he

> did then and there willfully, unlawfully, and feloniously and with or without design to effect, kill, and murder Ma'Leah Grace Bush, a human being, while in the commission of the crime and felony of Felonious Child Abuse and/or Batter[y] of a Child, as defined by Section 97-5-39(2).

The indictment properly sets forth the elements of capital murder and identifies the underlying felony, section, and subsection of the statute defining felony child abuse. Lewis's underlying felony was not burglary, and the indictment required nothing more that what was listed. Applying a de novo standard of review, we therefore find that his indictment comports with Mississippi law and due process.

### III. Whether the indictment must include aggravating factors and mens rea elements for capital murder cases.

¶36. Lewis's third argument is that the indictment charging him with capital murder fails to include a statutory aggravating factor or a mens rea element pursuant to Mississippi Code Annotated section 99-19-101(5) and (7) (Supp. 2013). Lewis asserts:

> A Mississippi jury's finding of an aggravating circumstance and a mens-rea element increased the penalty over the statutory maximum absent that circumstance, and therefore implicates the Due Process of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, and the corresponding provisions of our state constitution.

¶37. Mississippi Code Annotated section 99-19-101(1) states that once a defendant is

17

convicted of capital murder, the trial court shall conduct a separate proceeding before the jury for the purpose of deciding whether the defendant should be sentenced to death, life imprisonment without eligibility for parole, or life imprisonment. Lewis specifically points to subsections (5) and (7), which concern the aggravating factors and mens rea elements the jury must consider before sentencing a defendant to death. In this case, however, the State chose not to pursue the death penalty, and Lewis was sentenced to life without parole rather than to death. Nothing in the statute requires the State to list the aggravating factors or mens rea elements when the death penalty is not sought, and therefore, this issue lacks merit.

¶38. Also, Lewis makes the exact same argument that failed in *Loden v. State*, 971 So. 2d 548 (Miss. 2007). In *Loden*, the defendant was convicted of capital murder, rape, and four counts of sexual battery and sentenced to death. *Loden*, 971 So. 2d at 559 (¶18). Similar to Lewis, the defendant in *Loden* argued that in light of the holdings in *Blakely v. Washington*, 542 U.S. 296 (2004);[1] *Ring v. Arizona*, 536 U.S. 584 (2002); and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the failure to include aggravating factors and mens rea elements in the charging indictment requires that the defendant's sentence be vacated and the case be

---

[1] In *Apprendi*, the United States Supreme Court held that, for sentencing purposes, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. In *Ring*, the Supreme Court held that, following the defendant's conviction of first-degree murder, the trial judge alone cannot determine the presence or absence of aggravating factors for purposes of imposing the death penalty; such a determination must be made by a jury. *Ring*, 536 U.S. at 589. The Supreme Court then expanded upon the definition of a "statutory maximum" in *Blakely*, holding that the trial judge may only impose the statutory maximum based upon the facts found by the jury resulting in the jury verdict. *Blakely*, 542 U.S. at 303-04. Any sentence predicated upon additional findings solely made by the trial judge violates the defendant's Sixth Amendment rights. *Id*.

18

remanded for the imposition of a life sentence. *Loden*, 971 So. 2d at 565 (¶35). The

Mississippi Supreme Court rejected this argument, however, finding that the holdings in

*Blakely*, *Ring*, and *Apprendi* "have no applicability to Mississippi's capital murder sentencing

scheme." *Loden*, 971 So. 2d at 565 (¶35). Further, the *Loden* court held that "an indictment

is sufficient without listing aggravating circumstances, as anytime an individual is charged

with murder, he is put on notice that the death-penalty may result. And our death penalty

statute clearly states the only aggravating circumstances which may be relied upon by the

prosecution in seeking the ultimate punishment." *Id.* (citing *Williams v. State*, 445 So. 2d

798, 804-05 (Miss. 1984) (internal quotation mark omitted). Because the holding in *Loden*

equally applies to Lewis's case, we find that this issue lacks merit for this reason as well.

IV. **Whether the circuit court erred by denying Lewis's motion to dismiss and refusing a jury instruction regarding spoliation of evidence.**

¶39. After Ma'Leah's death, Dr. McGarry conducted the autopsy at the Edmond Fahey

Funeral Home in Waveland, Mississippi. In his report, Dr. McGarry indicated that he took

samples of blood, urine, gastric contents, vitreous fluid, tissue, oral swabs, and fingernail

scrapings during his examination. Lewis hired an expert pathologist, Dr. James R.

Lauridson, to review the autopsy report and conduct further testing of the samples noted in

the report. Lewis claims that he requested the tissue samples but was advised by the State

that the tissue samples did not exist. Before trial, Lewis filed an unsuccessful motion to

dismiss based upon the spoliation of the tissue samples. Lewis also submitted a jury

instruction on spoliation at the close of trial, but the circuit court refused to give this

19

instruction. Lewis now challenges the circuit court's denial of his motion to dismiss and the refusal to give his requested jury instruction based upon the spoliation of evidence.

¶40.     "The State has the duty to preserve evidence, but that duty is limited to the evidence which 'might be expected to play a significant role in the suspect's defense.'" *Northup v. State*, 793 So. 2d 618, 623-24 (¶16) (Miss. 2001) (quoting *California v. Trombetta*, 467 U.S. 479, 488 (1984)).   To determine whether the State violated Lewis's due process rights based upon destruction or spoliation of evidence, Lewis must show: (1) the evidence in question possessed a significant, exculpatory value that was apparent before it was destroyed or lost; (2) Lewis had no possible means by which to obtain comparable evidence; *and* (3) the State destroyed or failed to preserve the evidence in bad faith.  *See Young v. State*, 236 So. 3d 49, 56 (¶¶30-31) (Miss. 2017).  Lewis must meet all three of these requirements to prove that his due-process rights were violated.  *Childs v. State*, 133 So. 3d 348, 350 (¶10) (Miss. 2013).

¶41.     As to the apparent exculpatory value of the evidence, Lewis argues that the tissue samples were "critical evidence needed for the defense" because these samples would have determined the timing of Ma'Leah's injuries.  To support his argument, Lewis cites two affidavits provided by Dr. Lauridson.  The first affidavit, however, states that the tissue samples were important to Lewis's case because examination of the samples "*could* have provided a basis for an informed opinion as to the timing of the injury."  Dr. Lauridson's second affidavit speculated that tissue samples actually were collected during the autopsy because he had "personal knowledge of numerous autopsies that were performed by Dr. McGarry in the past, and he kept tissue samples after he performed his autopsies and

20

examined them."

¶42. The State also submitted an affidavit from Dr. LeVaughn. In the affidavit, Dr. LeVaughn stated that upon reviewing the autopsy report, photographs, and all medical records from Hancock Medical Center and the Children's Hospital of New Orleans, he concluded that Ma'Leah's cause of death was blunt-head injury and that the manner of death was homicide. Dr. LeVaughn further stated that "[t]issue samples . . . were not necessary or helpful to determine the time of injury or the cause or manner of death in this case."

¶43. At trial, defense counsel questioned Dr. LeVaughn about Dr. Lauridson's affidavit and the ability to determine the time and date of an injury based upon tissue samples. Dr. LeVaughn stated, "You can do that, but you need to do that with caution." Dr. LeVaughn testified that determining the exact time and date of an injury is "extremely risky" and "difficult, if not impossible" for any pathologist to do. Dr. LeVaughn also explained his own conclusions, testifying that "[i]f I looked at the tissue samples I would see exactly what I would see with the naked eye. There would be hemorrhage under the skin." Dr. LeVaughn further explained that had Ma'Leah suffered her injuries at an earlier time, the tissue samples would not be helpful because given the extent of her injuries, she would have exhibited symptoms immediately. These immediate symptoms, such as hemorrhaging in the scalp, would be examinable with the naked eye.

¶44. In addition to Dr. LeVaughn's conclusions, Drs. Byrnes, Jackson, and Leon also testified that Ma'Leah would have exhibited symptoms of such severe injuries immediately. Dr. Byrnes testified specifically that any adult supervising Ma'Leah around the time that she

was injured would have known that she was in immediate need of medical assistance. Dr. Jackson testified that Ma'Leah would have been unresponsive and unable to walk or talk "right when this [injury] happened."

¶45. Weighing Dr. Lauridson's testimony against the testimony provided by Drs. LeVaughn, Byrnes, Jackson, and Leon, we find that the tissue samples possessed no significant exculpatory value that would have been apparent before it was lost. The supreme court has recently held that where a defendant provides no clear indication that certain evidence possesses an apparent exculpatory value, the defendant fails to satisfy the first prong of the spoliation test. *Robinson v. State*, 247 So. 3d 1212, 1234 (¶55) (Miss. 2018). In his affidavits, Dr. Lauridson stated that the tissue samples *could* be potentially useful to examine the time and date of Ma'Leah's injuries. Dr. Lauridson also opined that Dr. McGarry *should* have retained tissue samples simply because tissue samples were taken in other autopsies that Dr. McGarry performed. Such conclusions amount to mere speculation.

¶46. Additionally, we find no evidence in the record of bad faith by the State or the police. Lewis relies heavily on the case of *State v. McGrone*, 798 So. 2d 519 (Miss. 2001), to support this assignment of error. In *McGrone*, the defendant argued that his due-process rights were violated when the police lost a pair of pants the defendant was wearing when he was apprehended. *McGrone*, 798 So. 2d at 521 (¶5). The Mississippi Supreme Court added the bad-faith requirement to the spoliation test, holding that a defendant's due process rights can only be violated upon a showing of an intentional effort on the part of the State to deprive the defendant of evidence. *Id*. at 522 (¶10). The Supreme Court found that the

police exhibited bad faith after failing to appear for testimony at two separate hearings regarding the pants. *Id*. at 522-23 (¶¶11-12).

¶47. Unlike in *McGrone*, Lewis points to no evidence of bad faith on the part of the State. In fact, Allen, police chief at the time of Ma'Leah's death, testified at length about his efforts to obtain tissue samples after the autopsy. Allen testified that he was the primary officer at Ma'Leah's autopsy but did not see Dr. McGarry obtain any tissue samples during the process. He explained that typically, any tissue samples obtained would be placed in a container and given to law enforcement following the autopsy. Following Ma'Leah's autopsy, however, Allen testified that Dr. McGarry never turned over any samples to him or to the Waveland Police Department. Allen further testified that, upon learning that tissue samples were potentially missing, he contacted the Edmond Fahey Funeral Home and its manager, who stated that no tissue samples were received or kept from Ma'Leah's case. Allen also testified to contacting the coroner, Jim Faulk, and having two of his officers search Faulk's office for the tissue samples. When no tissue samples were found there, Allen contacted the Riemann Funeral Home in Gulfport, Mississippi, where Dr. McGarry often stored items obtained from the autopsies he conducted. No tissue samples or record of any such samples were found at the Riemann Funeral Home.

¶48. In support of his motion to dismiss, Lewis fails to provide a sufficient showing of bad faith on the part of the State, as well as any significant and apparent exculpatory value of the tissue samples. In fact, the record contains no sufficient evidence that tissue samples existed at all. As such, we find no violation of Lewis's due process rights, and we also find that the

23

circuit court properly denied Lewis's motion to dismiss. With regard to his requested jury instruction on spoliation, Lewis's counsel admitted during trial that he offered no evidence to warrant such instruction. Therefore, we find that the circuit court properly denied this instruction.

### V. Whether the circuit court erred in admitting improper 404(b) evidence before the jury.

¶49. Lewis next argues that the circuit court erroneously admitted improper character evidence of Ma'Leah's injuries in violation of Mississippi Rule of Evidence 404(b). Rule 404(b)(1) prohibits circuit courts from admitting evidence of a person's prior crimes, wrongs, or other acts as a means of proving "that on a particular occasion the person acted in accordance with the character trait." "The reason for the rule is to prevent the State from raising the inference that the accused has committed other crimes and is therefore likely to be guilty of the offense charged." *White v. State*, 842 So. 2d 565, 573 (¶24) (Miss. 2003). Lewis specifically argues that the circuit court erred by allowing "evidence of pinching and finger fractures, all in various stages of healing" to be admitted. Lewis contends that this evidence created an inference by the State that he injured Ma'Leah on a prior occasion and therefore was guilty of the injuries that led to her death.

¶50. The first mention of these injuries actually came from Amanda's cross-examination by Lewis's own counsel. In fact, defense counsel specifically asked Amanda, "[W]as there ever an opportunity or event where [Ma'Leah] had her hand hurt or her fingers hurt?" Amanda affirmatively responded, stating that she was first made aware that Ma'Leah had hurt her fingers after returning from the home of Kay Dawson, a lady who had custody of

24

Ma'Leah prior to Lewis. Because Lewis's counsel first "opened the door" by addressing Ma'Leah's prior injuries, Lewis cannot now complain of alleged errors he invited. *See Smith v. State*, 984 So. 2d 295, 302 (¶18) (Miss. Ct. App. 2007); *see also Rubenstein v. State*, 941 So. 2d 735, 755 (¶52-53) (Miss. 2006).

¶51.    The evidence in question was also mentioned during Dr. Jackson's testimony. In her testimony, Dr. Jackson named each specific injury found during her examination of Ma'Leah, which included evidence of bruising around the ears and finger fractures. However, Dr. Jackson included these injuries among her long list of injuries that she found once Ma'Leah was in her care at the Children's Hospital of New Orleans. She testified that the fractures were found on Ma'Leah's right hand, which radiology read to have possibly been sustained "two to four weeks out." No mention of Lewis was made during Dr. Jackson's testimony regarding these fractures. There is no evidence that the State attempted to draw a link during this testimony between Lewis and any injury Ma'Leah may have sustained prior to the subject incident. In fact, both the State and Lewis presented evidence that Ma'Leah had stayed with people other than Lewis in the weeks and days before her death—namely Dena and Dawson.

¶52.    In Lewis's case-in-chief, his counsel presented testimony from Dawson. Dawson testified that Ma'Leah fell on her hand once while in Dawson's care, though Dawson could not tell which hand or whether Ma'Leah's fingers were injured as a result of this incident. Dawson also testified to "popping" Ma'Leah's hands as a form of discipline. This, along with Amanda's testimony, creates less of an inference that Lewis caused any prior injuries

25

Ma'Leah may have sustained.

¶53.    Also, prior to trial, Lewis filed a motion in limine pertaining to Rule 404(b) evidence. The motion in limine sought to preclude evidence of text messages and witness testimony relating to Lewis's discipline practices and alleged incidents of abuse prior to Ma'Leah's death. However, there was no mention of the evidence Lewis now claims to be prejudicial. No objection was made during Dr. Jackson's testimony either. Therefore, any issue to which Lewis failed to object is also procedurally barred. *See Rubenstein*, 941 So. 2d at 755 (¶49).

¶54.    Lewis first opened the door to allow testimony of finger fractures to enter before the jury. Even then, the State made no effort to infer that Lewis had in fact caused the pinching or finger fractures in a separate incident prior to Ma'Leah's death. In fact, both the State and Lewis presented evidence suggesting that Ma'Leah had sustained the finger injuries outside of Lewis's care. Finally, while Lewis objected to *other* potential Rule 404(b) evidence, he never objected before trial or during trial to the evidence he now claims to be admitted in error. We find this claim to be meritless, and the circuit court did not abuse its discretion by admitting this evidence.

> **VI.    Whether the circuit court erred in denying Lewis's culpable negligence instruction.**

¶55.    At the close of trial, Lewis unsuccessfully requested that a jury instruction regarding culpable negligence. Lewis now contends that the circuit court erroneously refused to submit the culpable-negligence instruction, thereby violating his due-process rights. However, as the State correctly points out, Lewis provides no argument and no authority in his brief or reply brief as to why the circuit court erred and why he was entitled to such instruction.

26

Mississippi Rule of Appellate Procedure 28(a)(7) requires that an appellant brief "shall contain the contentions of the appellant with respect to the issues presented, and the reasons for those contentions, with citations and authorities, statutes, and parts of the record relied upon." To support his argument, however, Lewis includes only the following: (1) a restatement of section 97-3-19(3) regarding indictments that put defendants on notice of lesser-included offenses; (2) the statement that Jury Instruction D-6A was withdrawn; and (3) a restatement of a withdrawn jury instruction seemingly prepared by the circuit court. Rule 28(a) "does not simply require a party to mention authority; the authority must be used to develop the argument in a meaningful way." *Walker v. State*, 197 So. 3d 914, 919 (¶25) (Miss. Ct. App. 2016). Because his argument regarding the culpable-negligence instruction does not comply with Rule 28(a)(7), it is procedurally barred. *Hill v. State*, 215 So. 3d 518, 523-24 (¶10) (Miss. Ct. App. 2017).

¶56. Despite the procedural bar, we also find that Lewis's argument lacks merit. The circuit court refused to submit a culpable-negligence instruction because it found no sufficient evidentiary basis to support the instruction. A criminal defendant is entitled to jury instructions supporting his theory of the case but only where sufficient evidence supports such instructions. *Gilmore v. State*, 119 So. 3d 278, 286 (¶13) (Miss. 2013). The supreme court has held:

> Our law is well-settled that jury instructions are not given unless there is an evidentiary basis in the record for such . . . . To warrant the lesser-included-offense instruction, a defendant must point to some evidence in the record from which a *reasonable* jury could find him not guilty of the crime with which he was charged and at the same time find him guilty of a lesser-included offense.

27

*Goodnite v. State*, 799 So. 2d 64, 69 (¶24) (Miss. 2001) (citation omitted) (emphasis added).

When determining the propriety of a lesser-included-offense instruction, "[w]e must view the evidence in the light most favorable to the defendant." *Gilmore*, 119 So. 3d at 286 (¶13). Also, "lesser-included-offense instructions should not be granted on mere speculation." *Franklin v. State*, 136 So. 3d 1021, 1026-27 (¶11) (Miss. 2014). We will only reverse the circuit court's denial of a lesser-included-offense instruction where an evidentiary basis for the instruction exists in the record. *Sheffield v. State*, 64 So. 3d 529, 533 (¶13) (Miss. Ct. App. 2011).

¶57. To warrant a culpable-negligence instruction, Lewis was required to show some evidentiary basis that a reasonable jury could convict him of the crime while also finding him not guilty of the original crime of capital murder. *See Smith v. State*, 171 So. 3d 542, 546 (¶9) (Miss. Ct. App. 2015). We define culpable negligence as "the conscious and wanton or reckless disregard of the probabilities of fatal consequences to others as a result of the willful creation of an unreasonable risk thereof." *Chandler v. State*, 946 So. 2d 355, 361 (¶22) (Miss. 2006). Manslaughter by culpable negligence has been defined as "such gross negligence . . . as to evince a wanton or reckless disregard for the safety of human life, or such an indifference to the consequences of an act under the surrounding circumstances as to render such conduct tantamount to willfulness." *Id*. (quoting *Shumpert v. State*, 935 So. 2d 962, 967 (¶14) (Miss. 2006)).

¶58. At trial, defense counsel questioned Drs. Byrnes, Jackson, and Leon about the possibility that Ma'Leah died as a result of a "crush injury." Defense counsel did so to

support the alternative defense theory that while Ma'Leah and Lewis were sitting on the couch the night of the incident, Lewis rolled over onto Ma'Leah, causing the injuries that led to her death. However, "the questions asked by lawyers [are] not evidence—only the answers given by witnesses." *May v. State*, 460 So. 2d 778, 783 (Miss. 1984). None of the doctors corroborated defense counsel's theory. Dr. Byrnes testified that he had never heard of a child sustaining the severity of injuries that Ma'Leah had due to a parent rolling onto the child. Dr. Jackson and Dr. Leon both testified that children can suffer from suffocation when a parent rolls onto them during sleep but not significant skull fractures. Dr. Leon further testified that Ma'Leah would not have sustained such severe multi-layer hemorrhaging in her eyes had Lewis simply rolled onto her.

¶59. Defense counsel argued during the jury-instruction conference that Michaela's testimony provided an evidentiary basis for a culpable-negligence instruction. Michaela testified, however, that she "heard three slapping noises" and walked into the living room. Michaela further stated that Lewis looked at Michaela and said, "I didn't touch [Ma'Leah]," and then Michaela went back into Jalen's room. Michaela testified that she went back into the living room, picked Ma'Leah up from the couch to take her to bed, and saw a "bump" on Ma'Leah's head. This testimony hardly provides a sufficient evidentiary basis to support a culpable-negligence instruction. Furthermore, Lewis himself stated to medical professionals following the incident and also repeatedly testified at trial that Ma'Leah died due to injuries that resulted from falling out of her bed.

¶60. Based upon the facts and testimony at trial, we find no sufficient evidentiary basis to

29

warrant a culpable-negligence instruction. We therefore find that the circuit court did not abuse its discretion in refusing to grant such an instruction.

## VII. Whether the underlying felony of child abuse may be used as an aggravating factor.

¶61. Lewis next asserts that the circuit court erroneously allowed the underlying felony of child abuse to be used as an aggravating factor for sentencing, which he argues is unconstitutional. This argument lacks merit for two reasons. First, the Mississippi Supreme Court requires a jury to find the existence of at least one aggravating factor, beyond a reasonable doubt, before imposing the *death penalty*. *Ronk v. State*, 172 So. 3d 1112, 1141 (¶72) (Miss. 2015). Where the jury finds that mitigating circumstances outweigh any aggravating factors, then the jury has a "duty to render a sentence of life without parole." *Id*. Again, because the State chose not to pursue the death penalty in this case, we reject this argument.

¶62. Second, this same issue arose in *Brawner v. State*, 947 So. 2d 254, 265 (¶28) (Miss. 2006), and the supreme court found no merit to the argument. The *Brawner* court held as follows:

> We have consistently upheld the use of the underlying felony as an aggravating factor during sentencing. *Goodin v. State*, 787 So. 2d 639, 654 (Miss. 2001) (citing *Walker v. State*, 671 So. 2d 581, 612 (Miss. 1995)). The argument is the familiar "stacking" argument. It contends that it is unconstitutional for the State to elevate murder to capital murder and then, using the same factor, elevate the sentence to death. As pointed out in *Lockett v. State*, 517 So. 2d 1317, 1337 (Miss. 1987), this Court has consistently rejected this argument. *Goodin*, 787 So. 2d at 654; *Davis v. State*, 684 So. 2d 643, 664 (Miss. 1996).

*Brawner*, 947 So. 2d at 265 (¶28). We apply this same logic and holding to the present case

30

and, applying a de novo review, we find that Lewis's argument lacks merit.

**VIII.   Whether the circuit court was required to hold a jury hearing before sentencing Lewis to life without eligibility for parole.**

¶63.   After the jury returned its guilty verdict for capital murder, the circuit court immediately sentenced Lewis to life without eligibility for parole pursuant to Mississippi Code Annotated Section 97-3-21(3) (Supp. 2013). Lewis's final argument is that the circuit court erred by imposing this sentence without first conducting a jury hearing as stated in section 99-19-101(1).

¶64.   Section 97-3-21(3) states:

> Every person who shall be convicted of capital murder shall be sentenced (a) to death; (b) to imprisonment for life in the State Penitentiary without parole; or (c) to imprisonment for life in the State Penitentiary with eligibility for parole as provided in Section 47-7-3(1)(f).

Miss. Code Ann. § 97-3-21 (Supp. 2013). Under section 47-7-3(1)(f), Lewis would be ineligible for parole, as the statute states:

> No person shall be eligible for parole who is convicted or whose suspended sentence is revoked after June 30, 1995, except that an offender convicted of only nonviolent crimes after June 30, 1995, may be eligible for parole if the offender meets the requirements in subsection (1) and this paragraph . . . . For purposes of this paragraph, "nonviolent crime" means a felony other than **homicide**, robbery, manslaughter . . . **felony child abuse**.

Miss. Code Ann. § 47-7-3(1)(f) (Supp. 2011) (emphasis added).

¶65.   Section 99-19-101(1) states, however, that once a defendant is found guilty of capital murder, "the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death, life imprisonment without eligibility for parole, or life imprisonment." Miss. Code Ann. § 99-19-101(1). Lewis argues that the language of

31

section 99-19-101(1) mandates that a separate hearing be held to allow the jury to sentence him within the purview of Section 97-3-21(3).

¶66.    To support his argument, Lewis cites to the supreme court's recent holding in *Moore v. State*, 2017-KA-00379-SCT, 2019 WL 4316161, at *10 (¶59) (Miss. May 30, 2019).  In *Moore*, the supreme court held as a matter of first impression that, where a juvenile defendant is convicted of capital murder, the circuit court is required to hold a separate sentencing hearing before the jury to determine his sentence.  *Id*. at *10 (¶54).  In so deciding, the supreme court reconciled the statutory language in section 97-3-21, section 47-7-3(1)(f), and section 99-19-101(1) with the United States Supreme Court's holding in *Miller v. Alabama*, 567 U.S. 460 (2012).  The *Miller* court's decision made it unconstitutional to impose a mandatory life sentence without the possibility of parole for a juvenile defendant because doing so violated the defendant's Eighth Amendment right to be free from cruel and unusual punishments.  *Miller*, 567 U.S. at 479.  In light of *Miller*, our supreme court held in *Moore* that the circuit court could not rightfully impose a sentence of life imprisonment without parole without first conducting a jury hearing to determine such sentence.  *Moore*, at *10.

¶67.    Lewis argues that we should apply the supreme court's decision in *Moore* to his case.  The facts in *Moore* are distinguishable from Lewis's case, however, as evidenced by *Moore*'s discussion of *Pham v. State*, 716 So. 2d 1100 (Miss. 1998).  In *Pham*, the defendant was convicted of capital murder, but the State chose not to pursue the death penalty.  *Moore*, 2019 WL 4316161 at *10 (citing *Pham*, at 1101 (¶1) (Miss. 1998)).  Section 47-7-3(1)(f) made the

adult defendant in *Pham* ineligible for parole, and therefore, only one sentence was available to him—life without eligibility for parole. *Pham*, 716 So. 2d at 1103 (¶20-21). As such, the *Pham* court affirmed the circuit court's sentencing of life without eligibility for parole without a jury hearing. *Id*. at 1104 (¶24). The *Moore* Court agreed with the holding in *Pham*, finding that the circuit court had vested authority to impose such sentence where "the parole statutes leave only one sentencing option." *Moore*, 2019 WL 4316161 at *10 (¶55). The court also clarified that "our holding today is limited to the facts of this case: a minor convicted of capital murder post-*Miller* who was denied sentencing by a jury." *Id*. at (¶57). Therefore, the *Moore* court held that because *Miller* allows a juvenile defendant to be eligible for parole, a jury hearing is required before that defendant may be sentenced to life imprisonment without parole. *Id*. at (¶59).

¶68.     After reviewing the *Moore* court's analysis of *Pham*, we disagree with Lewis's argument that the holding in *Moore* was meant to extend to cases involving adult defendants. Also, this Court holds no authority to extend such a holding past the parameters specifically stated in *Moore*. Because Lewis was thirty years old at the time of the crime, section 47-7-3(1)(f) renders him ineligible for parole as an adult defendant. Therefore, the supreme court's holding in *Pham* very much controls this case. While statutory law suggests an "apparent necessity of a choice between death, life, and life without parole, in reality there is really only a choice between death and life without parole" in capital cases of this nature. *Pham*, 716 So. 2d at 1103 (¶21). As in *Pham*, the State here did not seek the death penalty, and the jury reached a guilty verdict for capital murder here. *See id*. Therefore, the circuit

33

court was left with no sentencing option in Lewis's case but life without eligibility for parole. Lewis's due-process rights were not violated by the circuit court "cutting out the extra, but meaningless, procedural step." *Id*. at 1104 (¶24).

¶69. We also acknowledge that, under the plain language of section 47-7-3(1)(f), Lewis's capital murder, or homicide, conviction made him ineligible for parole. As such, the circuit court *statutorily* had no choice but to sentence him to life without eligibility for parole. We therefore find no abuse of discretion in the circuit court's sentence of life without eligibility for parole without a jury hearing.

## CONCLUSION

¶70. We find no error on the part of the circuit court in this case. We therefore affirm Lewis's conviction and sentence to life without eligibility for parole.

¶71. **AFFIRMED.**

**BARNES, C.J., CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR.**

34